PROFESSIONAL DRIVERS COUNCIL, John Torbet, and David Gaibis, Petitioners,

v.

BUREAU OF MOTOR CARRIER SAFETY, and United States of America, Respondents.

No. 81–2283.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1982.

Decided April 26, 1983.

As Amended April 27, 1983.

Arthur L. Fox, II, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on the brief, for petitioners.

Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., and Kenneth N. Weinstein, Atty., Dept. of Transp., Washington, D.C., were on the brief, for respondents. Kenneth M. Raisler, Asst. U.S. Atty., Washington, D.C., also entered an appearance for respondents.

Before MacKINNON and GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge.

After six years of study, investigation, and hearings which the Secretary of Transportation initiated, in part, in response to a petition by the Professional Drivers Council, the Secretary decided not to amend the regulations governing the hours-of-service for over-the-road truck drivers. The Drivers petition for review of this refusal. We affirm the decision of the Secretary.

## I. BACKGROUND

On September 3, 1981, the Bureau of Motor Carrier Safety (Bureau) terminated rulemaking proceedings designed to amend the regulations which govern the hours-of-service for drivers of commercial motor vehicles. The agency decided *not* to amend the existing regulations. On October 1, 1981, the Professional Drivers Council (Drivers) petitioned the Secretary of Transportation (Secretary)[1] to reconsider the decision to terminate rulemaking and requested that rulemaking, addressing three specific "loopholes" in the existing scheme, be reinitiated. On November 20, 1981, the Secretary denied the Drivers' petition. The Drivers petitioned for review in this court seeking to have the Secretary's actions reversed as being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The Drivers assert that the existing hours-of-service regulations are inadequate and that the agency has steadfastly refused to close "loopholes" in the regulations.[2]

The first hours-of-service regulations, enacted by the Interstate Commerce Commis-

---

1. Responsibility for motor carrier operations and safety was originally vested in the Interstate Commerce Commission. Motor Carrier Act, 49 Stat. 543 (1935). In 1966, Congress enacted the Department of Transportation Act, 80 Stat. 931, wherein the authority to issue motor carrier safety regulations was transferred from the Interstate Commerce Commission to the Secretary of Transportation. 49 U.S.C. § 1655(e)(6)(C) (1976). The Federal Highway Administrator is empowered to carry out the duties of the Secretary in the area of motor carrier safety. 49 U.S.C. § 1655(f)(3)(B) (1976); 49 C.F.R. § 1.48(f) (1982). The Federal Highway Administrator's responsibilities for motor carrier safety are, in turn, delegated to the Director of the Bureau of Motor Carrier Safety. 49 C.F.R. § 301.60(e) (1982).

   For clarity, all relevant agency actions will be attributed to the "Secretary," the statutorily designated authority.

2. Petitioners request this court to declare that the current rules "fail to carry out congressional and administrative objectives" and to remand this case to the agency with instructions to commence rulemaking so as to remedy three specific deficiencies in the hours-of-service regulations.

sion[3] pursuant to the Motor Carrier Act of 1935, 49 Stat. 543,[4] became effective on October 1, 1938 and governed only common and contract passenger carriers. 6 M.C.C. 557 (1938). On March 1, 1939, following extensive hearings, the Commission extended its hours-of-service regulations, with some modifications, to all common and contract property carriers. 11 M.C.C. 203 (1939). With certain modifications, these rules were eventually extended to cover private carriers as well. 23 M.C.C. 1 (1940).

From the beginning, regulating a driver's hours-of-service has not been an exact science and the agency has relied heavily upon its expertise in developing a regulatory scheme. As the Commission acknowledged in 1938:

> In reaching these determinations [establishing hours-of-service] the division recognized, as did all parties to the proceeding, that there was no statistical or other information which would enable it to say definitely how long a driver can safely work.

6 M.C.C. at 561. When reconsidering the applicability of the new rules to common and contract property carriers, the Commission stated:

> We are again confronted with the same lack of definite factual evidence that confronted us when we rendered our prior decision. No evidence has been sub-

---

Notwithstanding the fact that the existing rules may be less than perfect, this appeal cannot be the vehicle to challenge the hours-of-service rules which became effective in 1962. A direct, substantive challenge to any deficiencies in these rules is not timely. 28 U.S.C. § 2344 (1976). *Geller v. FCC,* 610 F.2d 973, 977 (D.C.Cir.1979).

This court has "scrutinized regulations immune from direct review by reviewing the denial of a subsequent rulemaking petition which challenged the regulation on demonstrable grounds of *substantive* invalidity." *Natural Resources Defense Council v. Nuclear Reg. Comm'n,* 666 F.2d 595, 602 (D.C.Cir.1981) (emphasis in original). *Accord Gage v. United States Atomic Energy Comm'n,* 479 F.2d 1214, 1222 & n. 27 (D.C.Cir.1973) (dicta). However, such "scrutiny" is limited to that permissible under the traditional "arbitrary and capricious" standard, and focuses not upon the regulatory scheme as a whole, but upon the more narrow issues as defined by the denial of the petition for rulemaking.

We review the Secretary's decisions at issue herein under this standard to determine whether, in light of all the information available, these decisions evidence reasoned decision-making within the Secretary's broad discretion. This review is not intended to examine these so-called "loopholes" in the regulatory scheme, except to the extent that we are satisfied that if in fact they do exist, they are not contrary to the statutory mandate. We will not venture into the realm of policy-making in the area of hours-of-service regulations as that is clearly beyond our expertise. Rather, this review focuses solely upon the propriety of the Secretary's decisions as tested by the traditional standard for review of agency decision-making.

**3.** The original rules governing the maximum hours-of-service for drivers of motor vehicles operated by common and contract carriers were promulgated by a division of the Commission and are contained in 3 M.C.C. 665 (1937).

**4.** The statutory authority for the Commission to promulgate hours-of-service regulations is contained in the Motor Carriers Act, 49 U.S.C. § 304 (1976).

> (a) Powers and duties generally
> It shall be the duty of the Commission—
> (1) To regulate common carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to ... qualifications and maximum hours of service of employees, and safety of operation and equipment.
> (2) To regulate contract carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to ... qualifications and maximum hours of service of employees, and safety of operation and equipment.
> (3) To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment.
> (3a) Notwithstanding any other provision of section 303(b) of this title, to establish for carriers of migrant workers by motor vehicle reasonable requirements with respect to ... qualifications and maximum hours of service of operators, and safety of operation and equipment.

This section of the original Motor Carriers Act was partially repealed. 92 Stat. 1466 (1978). Those portions authorizing hours-of-service regulations were not repealed. 49 U.S.C. § 304 (Supp. IV 1980). The Secretary of Transportation now exercises the regulatory authority in this area. *See* note 1 *supra.*

mitted at any hearing, and it is believed that none exists, which establishes that it is unsafe per se to permit a driver to drive or operate a vehicle for as long as 12 hours, unless such driver be off duty for 8 consecutive hours before he has driven 12 hours in the aggregate.

11 M.C.C. at 210. Notwithstanding this lack of factual foundation, the Commission, relying upon public comment and its own expertise, promulgated hours-of-service rules.

In 1959, the Commission initiated rulemaking proceedings which were intended to amend Part 195 of the Motor Carrier Safety Regulations which governs the hours-of-service for drivers.[5] Because of the substantial nature of the revisions proposed, extensive public hearings were held in three cities and, based upon this record, a hearing examiner submitted his recommendations for amending the regulations to the Commission.[6] After reviewing the examiner's recommendations, the Commission adopted the regulations as revised. The new regulations became effective July 16, 1962.[7] These regulations have remained essentially unchanged and are the regulations at issue in this case.

Seeking to insure the continuing vitality of the regulations, the Bureau of Motor Carrier Safety initiated research into the area of driver fatigue in the early 1970s. In 1972, the Bureau published the results of a year-long study of driver fatigue, *A Study of the Relationships Among Fatigue, Hours of Service, and Safety of Operations of Truck and Bus Drivers* ("Phase I Fatigue Study"). In response to this study the

Drivers filed a rulemaking petition requesting that the agency commence proceedings to amend the existing hours-of-service rules. The agency declined to commence rulemaking, choosing to await the results of additional studies. In November, 1973, the Drivers again petitioned the agency to initiate rulemaking. The agency again responded that more information was needed and refused to commence rulemaking. The Drivers filed suit based upon the agency's denial. This action was dismissed without prejudice to the filing of a subsequent action if, within eighteen months the agency did not publish a Notice of Proposed Rulemaking. *PROD, Inc. v. Brinegar,* Civ. No. 2098–73 (D.D.C. Sept. 12, 1974). An Advance Notice of Proposed Rulemaking was published in February, 1976.[8] The stated purpose of the notice was to solicit views regarding revision of the hours-of-service rules. The Advance Notice stated that although the Agency did "not have conclusive information . . . to support rule changes, [it was] in the process of conducting the final stages of . . . research efforts to scientifically quantify the relationships between hours of service of interstate truck and bus drivers and driver fatigue." [9]

Based upon the response to the 1976 Advance Notice, the agency concluded that the hours-of-service regulations needed "extensive revision" and the agency drafted "a preliminary set of proposals" for amendment of the existing rules. [Plans I, II, and III]. The agency revealed these proposals in an Advance Notice of Proposed Rulemaking, and announced that public hearings on

---

**5.** Notice of Proposed Rulemaking, 24 Fed.Reg. 4142 (1959).

**6.** Qualifications and Maximum Hours of Service of Employees of Motor Carriers and Safety of Operation and Equipment (Part 195), 89 M.C.C. 19 (1962).

**7.** 27 Fed.Reg. 3553 (1962) (codified at 49 C.F.R. §§ 395 *et seq.*).

**8.** 41 Fed.Reg. 6275 (1976).

**9.** *Id.* The agency continued to commission studies designed to quantify the relationship between driver fatigue and accidents. In Decem-

ber, 1974, prior to the Advance Notice, the results of a two-year study, *Heat, Noise, and Vibration in Relation to Driver Performance and Physiological Status,* were released. As the Bureau for Motor Carrier Safety had found the Phase I Fatigue Study inconclusive, a second study was commissioned, Phase II. This study was released in 1978. *Effects of Hours of Service, Regularity of Schedules, and Cargo Loading on Truck and Bus Driver Fatigue.* During the same year, another study was released, *Analysis of Accident Data and Hours of Service of Interstate Commercial Motor Vehicle Drivers.*

the plans would be held in seven major cities.[10] A majority of the public comments received during these hearings were in opposition to the proposals.[11]

In compliance with Executive Orders,[12] the agency conducted a Regulatory Impact Analysis (RIA) of each of the proposed amendments.[13] The RIA results indicated that "aggregate costs are far in excess of any foreseeable societal benefits emanating from possible changes to the existing regulations."[14]

On September 3, 1981, the agency terminated the rulemaking without amending the existing rules. The notice terminating the proceedings stated:

> The FHWA's [Federal Highway Administration] decision is based on the absence of evidence of a direct relationship between hours of service and a significant reduction in accidents and on the economic impact of the proposed options on motor carrier operations and the Nation's distribution system.

46 Fed.Reg. 44198 (1981). Following this announcement, the Drivers petitioned the Secretary to reconsider the decision and to reinstitute rulemaking specifically designed to remedy three deficiencies which the Drivers identified in the existing rules. On November 20, 1981, the Drivers' petition was denied. This petition for review followed.

## II. ANALYSIS

### A. *Standard of Review*

■ As this case involves informal rulemaking, the proper standard for judicial review is contained in 5 U.S.C. § 706(2)(A)–

(D) (1976). This standard of review requires a court to set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A). *Camp v. Pitts,* 411 U.S. 138, 140–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973); *Action for Children's Television v. FCC,* 564 F.2d 458, 478–79 (D.C.Cir.1977). Descriptions of the "arbitrary and capricious" standard emphasize that while such review is "searching and careful," it must also be circumspect. The reviewing court must be cautious not to substitute its judgment for that of the agency. The court's task is to discern whether the relevant factors were considered and whether the ultimate decision reflects reasoned decision-making.

■ We have previously reviewed an agency decision not to amend existing regulations. *Natural Resources Defense Council v. SEC,* 606 F.2d 1031 (1979); *Action for Children's Television v. FCC, supra.* The threshold consideration in exercising judicial review under these circumstances is to determine whether the action is in fact amenable to review. Cognizant of the factors considered in prior opinions which counsel against review of these discretionary agency decisions, we determine that the decisions challenged herein are reviewable.[15]

■ Our review is, however, limited. The circumscribed scope of this review is dictated by both the nature of the administrative proceeding (informal rulemaking) and by the nature of the ultimate decision (*not* to promulgate rules). The record in an informal rulemaking proceeding is "a less

---

**10.** Advance Notice of Proposed Rulemaking, 43 Fed.Reg. 21905 (1978).

**11.** Summary and tabulation of all written and oral comments received in the course of the hearings is contained in "Validation and Analysis of Hours of Service Data," Jt.App. at 125.

**12.** Exec. Order No. 12044, 43 Fed.Reg. 12661 (1978); Exec. Order No. 12291, 46 Fed.Reg. 13193 (1981).

**13.** Regulatory Impact Analysis, Part 395— Hours of Service of Drivers, Jt.App. at 189–91.

**14.** *Id.* at 190.

**15.** As the *Natural Resources* court observed, "in light of the strong presumption of reviewability, discretionary decisions not to adopt rules are reviewable where, as here, the agency has in fact held a rulemaking proceeding and compiled a record narrowly focused on the particular rules suggested but not adopted." 606 F.2d at 1047 (footnote omitted).

than fertile ground for judicial review" and has been described as a "sump in which the parties have deposited a sundry mass of materials." *National Resources Defense Council, supra,* 606 F.2d at 1052. Thus, the practical realities constrain our review. Furthermore, rulemaking is an inherently policy-oriented process and the agency must be accorded considerable deference in evaluating information presented and reaching decisions based upon its expertise. Our review is also circumscribed by the fact that the agency decided *not* to promulgate new rules in an area already heavily regulated. This is not a situation where the agency has shirked its statutory duty by refusing to regulate. The agency has regulated the field. In this instance, the agency's statutory authority to regulate is permissive. The statute provides that the agency "may establish reasonable requirements." The permissive nature of the statute implies broad agency discretion in selecting the appropriate manner of regulation. No regulatory scheme is perfect, and the agency's decision to refrain from amending the elaborate, established regulatory scheme cannot be disturbed absent a strong showing that such action was unreasonable. This is not to say that this court's review of the agency's action will be merely perfunctory. As Judge McGowan defined this illusive standard of review:

> [O]ur review of the [agency's] factual, and particularly its policy, determinations will perforce be a narrow one, limited to ensuring that the [agency] has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that those facts have some basis in the record. Finally, we must see "whether those facts and legislative considerations by themselves could lead a reasonable person to

make the judgment that the Agency has made."

*Natural Resources Defense Council, supra,* 606 F.2d at 1053 (citations and footnotes omitted).[16]

### B. *Termination of Rulemaking Proceedings*

The agency declined to adopt any of the proposals contained in the 1978 Advance Notice and closed its rulemaking proceedings. In support of this decision, the agency cited the "absence of evidence of a direct relationship between hours of service and a significant reduction in accidents" and "the economic impact of the proposed options on motor carrier operations and the Nation's distribution system."[17] The agency also noted the substantial opposition to amending the regulations as reflected in the comments, both written and orally presented at public hearings.[18] The agency clearly articulated the factual and policy bases for its decision. There can be no question but that the agency's decision

> is blessed with an articulated justification that makes a "rational connection between the facts found and the choice made," and follows upon a "hard look" by the agency at the relevant issues.

*Action for Children's Television, supra,* 564 F.2d at 479 (footnotes omitted).

Reviewing the studies that it had commissioned, the agency concluded that no consistent relationship between driver fatigue, hours of driving, and motor vehicle accidents could be discerned which would require changing the existing regulations. The agency was unable to conclude that safety would be enhanced by adopting any of the three proposals.

---

**16.** An alternative statement of the appropriate standard of review under these circumstances is found in *Action for Children's Television, supra.* Therein, this court upheld the agency's decision not to promulgate either the rules recommended by the petitioner or alternative rules. The court stated that the agency's decision must be sustained

> if it violates no law, is blessed with an articulated justification that makes a "rational connection between the facts found and the

choice made," and follows upon a "hard look" by the agency at the relevant issues. 564 F.2d at 479 (footnotes omitted).

Application of this standard would also compel us to uphold the agency's decision in this case.

**17.** 46 Fed.Reg. at 41198.

**18.** *Id.* at 44199, 44201.

■ Petitioners assert that it was improper for the agency to base its decision upon this absence of direct evidence correlating driver fatigue, hours of service, and road accidents. Petitioners contend that the agency has "erected improper evidentiary burdens" because sufficient data correlating fatigue and accidents will never be available. The Drivers contend that in spite of the fact that reliable data is unavailable, the agency has a "congressional mandate" to promote safety and, therefore, the agency is *required* to amend its regulations. This position is untenable in light of the independence afforded the agency by its enabling statute. The statute is permissive in its language; directing that the agency "*may* establish reasonable requirements." 49 U.S.C. § 304(a)(1)–(2) (emphasis added). In fact, the agency has established such requirements. In deciding to terminate rulemaking proceedings, the Secretary concluded that insufficient evidence existed to warrant changing the existing requirements. Such a decision is based upon agency expertise and is accorded significant deference by this court.[19] With only inconclusive data available, the agency was relying upon its expertise to determine the best course for regulation. The agency was

clearly acting within its discretion in determining not to amend the existing regulations.

■ Petitioners also allege that the agency impermissibly allowed economic considerations to "dictate" its decision. Initially it should be noted that petitioners overstate their case. In reaching its decision the agency relied upon factors in addition to the economic ramifications of amending the regulations. Furthermore, the Drivers fail to reveal why the agency's consideration of economic impact was impermissible.[20] Executive Orders[21] specifically require an agency to evaluate the economic impact of its regulations. It was, therefore, permissible for the agency to consider costs and benefits in deciding not to amend its regulations.

The Bureau's decision to terminate rulemaking proceedings without amending its existing rules, after ten years of study and consideration of the issues, was a rational decision. The agency relied upon relevant, permissible factors, including its expertise, and its conclusions are supported by facts in the record. Therefore, the agency's decision to terminate rulemaking without

19. The *Natural Resources* court suggested that agency decision-making in areas of agency expertise presents serious reviewability problems because "the issues posed will often not be well-suited for judicial resolution." 606 F.2d at 1046. The court recognized:

> [E]ven if an agency considers a particular problem worthy of regulation, it may determine for reasons lying within its special expertise that the time for action has not yet arrived. The area may be one of such rapid technological development that regulations would be outdated by the time they could become effective, or *the scientific state of the art may be such that sufficient data are not yet available on which to premise adequate regulations.* The circumstances in the regulated industry may be evolving in a way that could vitiate the need for regulation, *or the agency may still be developing the expertise necessary for effective regulation.*

*Id.* (citations omitted) (emphasis added). Although the *Natural Resources* court cited these circumstances as counseling against review altogether, in reviewing the agency actions herein we find that these same circumstances operate to narrow the scope of our

review and reinforce our inclination to respect agency expertise in this area.

20. Contending that the agency may *not* consider economics in reaching its decisions, petitioners cite *United States v. American Trucking Ass'ns,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). This case does *not* support petitioners' contention. In *American Trucking,* the Court held that the ICC's statutory authority to regulate "the qualifications and hours of service employees" extended only to those employees "whose activities affect the safety of operation." *Id.* at 553, 60 S.Ct. at 1069. The Court did *not* define the *factors* to be considered when regulating hours of service; the only issue resolved was the scope of the word "employees" as used in the statute.

21. Exec. Order No. 12044, 43 Fed.Reg. 12661 (1978). This Executive Order, in effect during the initial rulemaking at issue, was superseded by Exec. Order No. 12291, 46 Fed.Reg. 13193 (1981). The new Order also required that an economic impact assessment be performed and considered *prior* to the enactment of a new regulation.

amending its hours-of-service regulations must be upheld.

## C. *Denial of Petition to Institute New Rulemaking Proceedings*

■ Petitioners also challenge the Secretary's denial of their petition to recommence rulemaking proceedings confined to the three "loopholes" in the regulations.[22] An agency possesses a "generous measure of discretion respecting the launching of rulemaking proceedings." *Geller v. FCC,* 610 F.2d 973, 979 (D.C.Cir.1979). "It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking." *WWHT, Inc. v. FCC,* 656 F.2d 807, 818 (D.C.Cir.1981).[23] Review of an agency's denial of a rulemaking petition is under the "arbitrary and capricious" standard and for purposes of review the court will look to the "petition for rulemaking, comments pro and con where deemed appropriate, and the agency's explanation of its decision to reject the petition." *Id.*

In this instance the Secretary clearly stated his reasons for denying the petition. After fully reviewing the reasons for terminating the hours-of-service proceeding, the Secretary stated:

> [W]e have no reason to believe that your specific proposals would, whether considered in isolation or not, justify rulemaking action given anticipated adverse public reaction, lack of safety benefits, and excessive cost to the industry. The likelihood of receiving new, persuasive, evidence and comments in favor of PROD's [the Drivers'] proposals through

a new rulemaking proceeding is too remote to justify further rulemaking action.

Jt. App. at 51.

■ The Secretary's refusal to recommence rulemaking proceedings came only approximately two and one-half months after the termination of six years of rulemaking proceedings addressing this very topic. The information acquired by the agency during these proceedings supports its decision not to initiate new rulemaking proceedings. The agency's assertion that it was unlikely that new information would be revealed in rulemaking proceedings is a reasonable conclusion.

The essence of petitioners' challenge is that the agency did not fairly assess the *particular* concerns cited by the Drivers, but rather denied the petition based on the conclusions reached vis-à-vis other proposed rules. It is well established that "[a]dministrative rulemaking does not ordinarily comprehend any rights in private parties to compel an agency to institute such proceedings or promulgate rules." *Rhode Island Television Corp. v. FCC,* 320 F.2d 762, 766 (D.C.Cir.1963).[24] The Drivers had no right to compel the agency to hold rulemaking proceedings addressing *its specific recommendations* for amending the existing rules. Nevertheless, in its response, the agency attempted to delineate the overlap between the changes sought by the Drivers and the amendments which had already been considered and rejected during the extensive rulemaking. It was the considered judgment of the agency that even limited

---

**22.** The Administrative Procedure Act provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e) (1976).

**23.** This court has directed an agency to reconsider its denial of a petition for rulemaking in only the most compelling circumstances. In *Geller v. FCC, supra,* 610 F.2d at 980 n. 59, this court held that the Commission could not simply dismiss a petition for rulemaking, but was required to re-examine the rules at issue to determine whether they continued to serve the public interest. On two other occasions an

agency has been required to reconsider its denial of a petition requesting commencement of rulemaking proceedings. *NAACP v. FPC,* 520 F.2d 432 (D.C.Cir.1975), *aff'd,* 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); *National Org. for Reform of Marijuana Laws v. Ingersoll,* 497 F.2d 654 (D.C.Cir.1974).

**24.** Courts have consistently recognized that while an agency may possess the authority to regulate an area, substantial discretion will be accorded an agency's decision not to promulgate regulations, *supra,* 564 F.2d at 479–80; *NAACP v. FPC, supra,* 520 F.2d at 447 n. 53.

amendment of the existing rules was not warranted given the inconclusive test findings and the generally negative public reaction to the suggested amendment of the rules. The agency reasonably exercised its discretion to deny the Drivers' petition to institute new rulemaking proceedings.

### III. Conclusion

This review focuses upon only two actions by the agency: (1) the termination of rulemaking proceedings without amending the rules; and (2) the denial of the Drivers' petition for recommencing rulemaking. In both instances, we find that the agency adequately considered the relevant factors and reached a reasoned decision. These agency actions are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The judgment of the Secretary is entitled to considerable deference and for the reasons set forth above we affirm his decision in both instances.

*Judgment accordingly.*