**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al., Plaintiffs,**

v.

**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, et al., Defendants.**

Civ. A. No. 82–2401.

United States District Court,
D. Columbia.

July 2, 1984.

Randy S. Rabinowitz, Zwerdling, Schlossberg, Leibig & Kahn, Washington, D.C., for plaintiff.

John D. Bates, Asst. U.S. Atty., Washington, D.C., for defendant.

Donald L. Morgan, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for intervenor defendant Formaldehyde Institute, Inc.

MEMORANDUM

JOHN LEWIS SMITH, Jr., District Judge.

The United Automobile Workers and the American Public Health Association bring this action for declaratory and injunctive relief against the Secretary of Labor and the Assistant Secretary of Labor for Occupational Safety and Health (hereinafter "OSHA" or "agency"). On March 3, 1983, the Formaldehyde Institute, a trade association composed of producers of formaldehyde and formaldehyde products, intervened as a party defendant. Currently before the Court are cross-motions for summary judgment.

On October 26, 1981, the UAW and thirteen other labor organizations petitioned OSHA to issue an Emergency Temporary Standard ("ETS") under Section 6(c) of the Occupational Safety and Health Act, 29 U.S.C. § 655(c), regarding workplace exposure to formaldehyde. The unions, citing evidence that formaldehyde may pose a "cancer risk to humans," requested that the ETS limit exposure to the lowest feasible level, and that employers be required to monitor exposures and provide protective clothing, respirators, and training to exposed employees. On January 29, 1982, OSHA denied the petition. Seven months later, plaintiffs filed this suit, seeking a declaration that OSHA's action was "arbitrary and capricious" and an order directing OSHA to immediately issue an ETS and begin permanent rulemaking proceedings under Section 6(b)(5) of the Act.

This is a case about an agency's decision *not* to act. Upon consideration of the volu-

minous record in this matter, and of the relevant statutory provisions and purposes, the Court concludes that while it should not compel issuance of an ETS, it should direct OSHA to reconsider its denial of plaintiff's petition and also its decision to refrain from instituting permanent rulemaking proceedings. As outlined below, a combination of factors support remanding the matter to the agency.

## A. *The OSHA Decision*

Plaintiffs' petition cited animal studies conducted by the Chemical Institute of Toxicology ("CIIT") and by New York University ("NYU") on the physiological effects of exposure to airborne formaldehyde. OSHA regulations, issued in 1972 because of formaldehyde's documented irritant qualities, limit workplace exposures to a time-weighted average of no more than three parts per million ("ppm") in any eight-hour period. *See* 29 C.F.R. 1910.-1000(b) (Table Z–2). The animal studies involved exposures of rats and mice at levels both above and below that limit:

"[The CIIT tests] show a 44 percent incidence of nasal cancer in rats at 14.3 ppm (103 carcinomas out of 232 animals examined), 0.9 percent incidence (not statistically significant) at 5.6 ppm (2 carcinomas/235 animals examined), and zero incidence at 2.0 ppm. The rats were exposed for six hours a day, five days a week, for up to two years (virtually the lifetime of the rats). In mice similarly exposed, CIIT found a 0.9 percent incidence (not statistically significant) at 14.3 ppm (2/235), and a zero incidence at 5.6 ppm and 2 ppm. *Id.*" Intervenor's Stmt. Mat. Facts ¶ 4.

"[The NYU study examined] rats exposed to formaldehyde at levels of 14 ppm. After approximately 1½ years of exposure, a statistically significant incidence of nasal cancer was observed in animals exposed to this substance alone and in combination with hydrogen chloride, while the animals not exposed at all or only to hydrogen chloride exhibited no heightened levels of such cancers (R. 3,

p. 11–12, 20)." Def.Pts.Auth.Mo.S.J. at 10–11.

*See also Gulf South Insulation v. CPSC*, 701 F.2d 1137, 1146 (5th Cir.1983) (describing CIIT study). Plaintiffs also attached supporting documents pertaining to occupational exposures to formaldehyde and concluded that "worker formaldehyde exposures frequently occur at air levels comparable to those leading to cancer in rats."

OSHA found that these materials did not support "emergency action on formaldehyde ... at this time:"

"The primary evidence upon which your petition stands are two new animal studies performed by the Chemical Industry Institute of Toxicology and New York University. The animal data indicates that formaldehyde causes nasal tumors in test animals at relatively high levels of exposure. However, in the studies these results are statistically significant only at exposure levels of approximately 15 ppm, substantially above the current permissible exposure limit (PEL) for formaldehyde of 3 ppm. Risk assessments that OSHA has performed on the animal data suggest that the risk from formaldehyde exposure at the PEL, when compared with other occupational risks, is not sufficient to warrant a finding of 'grave danger' and resulting emergency action. "In all ETS situations, OSHA must not only sustain the burden of proving that the ETS is justified by a grave danger, which we do not believe exists here, but also that the emergency action is necessary to protect employees. Information which you submitted along with your petition, such as the NIOSH monitoring results, indicates that exposure levels are generally below the current PEL of 3 ppm. This information is corroborated by OSHA inspection data ... Since OSHA already has a standard for formaldehyde which requires employee exposure to airborne formaldehyde to be kept quite low, and there are a number of other OSHA standards which will contribute to the protection of formaldehyde-exposed employees in certain circumstances, the data you submitted

would not enable us to make a showing that the emergency action you request is necessary."

### B. *Standard of Review*

OSHA actions involving its ETS powers are not the subject of frequent litigation. There are only four reported cases construing § 6(c), and but one of them—*Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150 (D.C.Cir.1983)—addresses an OSHA decision *not* to issue an ETS.[1] Moreover, only two of the four cases—*Public Citizen, supra* and *Asbestos Information Ass'n/North America v. OSHA, supra,*—arose after the Supreme Court's 1980 decision in *Industrial Union Dep't v. American Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) ("*API*"), a ruling coloring all subsequent interpretations of the standard-setting provisions of the Act, including § 6(c) (*see infra* at 17–19). Despite the paucity of cases, however, a number of factors have emerged from the cases and from general principles of administrative law that counsel an extremely narrow standard of judicial review in ETS litigation.

Section 6(c) provides in pertinent part:

"(c)(1) The Secretary shall provide, without regard to the requirements of chapter 5 of Title 5, for an emergency temporary standard to take immediate effect upon publication in the Federal Register if he determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards and (B) that such emergency standard is necessary to protect employees from such danger.

"(3) Upon publication of such standard in the Federal Register the Secretary shall commence a proceeding in accordance with subsection (b) of this section, and the standard as published shall also serve as a proposed rule for the proceeding. The Secretary shall promulgate a standard under this paragraph no later than six months after publication of the emergency standard as provided in paragraph (2) of this subsection." 29 U.S.C. § 655(c).

Several aspects of the statute are noteworthy. First, § 6(c) is mandatory in nature; once the appropriate findings are made, the agency "shall" issue an ETS. *See Public Citizen, supra,* 702 F.2d at 1156. Second, an ETS is short-lived; its issuance triggers commencement of permanent rulemaking proceedings under § 6(b)(5), and a permanent rule must issue "no later than six months" after publication of the ETS. *Cf. Asbestos Information Assn, supra,* 727 F.2d at 422, 426; *Florida Peach Growers Ass'n v. United States Dep't of Labor, supra,* 489 F.2d at 130 n. 16; *Dry Color Manufacturers Ass'n v. United States Dep't of Labor, supra,* 486 F.2d at 104–05 n. 9a. Third, the Act specifically exempts ETS determinations from the rulemaking (*i.e.,* notice and comment) requirements of the Administrative Procedure Act ("APA"). *Cf. Asbestos Information Ass'n, supra,* 727 F.2d at 422, 426; *Florida Peach Growers Ass'n, supra,* 489 F.2d at 130 n. 16; *Dry Color Manufacturers Ass'n, supra,* 486 F.2d at 104–05 n. 9a. Fourth, while the Act does provide guidelines for review of agency emergency standards, *see* 29 U.S.C. § 655(f), it does not address agency decisions not to issue them. Consequently, the APA's general provision concerning judicial review of informal agency action—the "arbitrary and capricious" test of 5 U.S.C. § 706(2)—provides the standard of review. *See Public Citizen, supra,* 702 F.2d at 1156–57. Fifth and

---

**1.** In *Public Citizen,* the D.C. Circuit reversed a district court order directing OSHA to issue an ETS on ethylene oxide. The Court, however, ordered OSHA to expedite pending permanent rulemaking proceedings. 702 F.2d at 1157–59. In the other cases, the Fifth and Third Circuits, applying the substantial evidence test of § 6(f), vacated or stayed enforcement of § 6(c) stan-

dards. *See Asbestos Information Ass'n/North America v. OSHA,* 727 F.2d 415 (5th Cir.1984) (asbestos); *Florida Peach Grower's Ass'n v. United States Dep't of Labor,* 489 F.2d 120 (5th Cir.1974) (organophosphorous pesticides); *Dry Color Manufacturers Ass'n v. United States Dep't of Labor,* 486 F.2d 98 (3d Cir.1973) (3.3'-dichlorobenzedine, ethyleneimine).

finally, OSHA cannot issue an ETS unless it determines that employees are exposed to "grave danger" and that immediate action is "necessary" to protect them. Needless to say, "the gravity and necessity requirements lie at the center of proper invocation of the ETS powers." *Asbestos Information Ass'n, supra*, 727 F.2d at 424.

Not surprisingly, the courts, considering the emergency and non-public character of ETS proceedings, consistently hold that the ETS power may be employed only in "limited situations." *Public Citizen, supra*, 702 F.2d at 1155. Section 6(c) represents "extraordinary power," and should be "delicately exercised." *Florida Peach Growers, supra*, 489 F.2d at 129. It may be used only as "an unusual response to exceptional circumstances." *Dry Color Manufacturers, supra*, 486 F.2d at 104 n. 9a. It is the "most dramatic weapon in [OSHA's] enforcement arsenal," *Asbestos Information Ass'n, supra*, 727 F.2d at 426, and accordingly, Congress "narrowly circumscribed the Secretary's power to issue" them. *API, supra*, 448 U.S. at 651, 100 S.Ct. at 2868. The exceptional nature of the ETS power, of course, must be considered by a court in deciding whether to compel its invocation. *Cf. Public Citizen, supra*, 702 F.2d at 1156–57.

The ETS cases also give due regard to the subject matter of the agency's action. The determination required by § 6(c)— whether emergency government action is "necessary" to protect workers from "toxic or physically harmful" substances—is "essentially legislative and rooted in inferences from complex scientific and factual data." *Public Citizen, supra*, 702 F.2d at 1156 (quoting *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1206 (D.C.Cir.1980), *cert. denied sub nom. Lead Industries Ass'n v. Donovan*, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981)). *See also Asbestos Information Ass'n, supra*, 727 F.2d at 427 ("[g]ravity of danger is a policy decision committed to OSHA, not the courts"). Such "mixed fact/policy judgments," based on incomplete or uncertain scientific evidence, are entitled to great deference, *Public Citizen,*

*supra*, 702 F.2d at 1156, and OSHA has the "prerogative to choose between conflicting evidence." *Asbestos Information Ass'n, supra*, 727 F.2d at 425. *See also API, supra*, 448 U.S. at 656–57, 100 S.Ct. at 2871. These observations are but manifestations in the ETS setting of a general principle of administrative law: when an agency "mak[es] predictions, within its area of special expertise, at the frontiers of science, [a] reviewing court must generally be at its most deferential." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983). *Cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, — U.S. —, —, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984).

The *Public Citizen* court also noted the "legislative", as well as "scientific" character of the action challenged here: an agency decision *not* to issue a rule. "[T]he scope of review of such a determination must, of necessity, be very narrow." *WHHT, Inc. v. FCC*, 656 F.2d 807, 809, 818 (D.C.Cir.1981). As the Court of Appeals recently observed:

> "rulemaking is an inherently policy-oriented process and the agency must be accorded considerable deference in evaluating information presented and reaching decisions based upon its expertise." *Professional Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1221 (D.C.Cir.1983).

*Cf. WWHT, Inc., supra*, 656 F.2d at 818 ("It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking."). Furthermore, "practical realities" constrain review: the "record" of such an informal proceeding is " 'less than fertile ground for judicial review' " and has been described as a " 'sump in which the parties have deposited a sundry mass of materials.' " *Professional Drivers Council, supra*, 706 F.2d at 1220–21 (quoting *Natural Resources Defense Council v. SEC*, 606 F.2d 1031, 1052 (D.C.Cir.1979)). This problem is particularly acute in ETS-review cases, for they pres-

ent a "record of a volume and technical complexity that would tax the competency of any court." *Asbestos Information Ass'n, supra,* 727 F.2d at 421.[2] *Cf. Florida Peach Growers Ass'n, supra,* 489 F.2d at 129; *Dry Color Manufacturers Ass'n, supra,* 486 F.2d at 105. In short:

"The type of administrative proceeding giving rise to the regulation, and the form of the record it produces, inevitably influences judicial review. A record like the one before us cannot be reviewed as a record in which adversary proceedings have narrowly focused the facts and issues in dispute." *Asbestos Information Ass'n, supra,* 727 F.2d at 421 (citation omitted).

The theme of these cases is one of deference and restraint. OSHA may issue an ETS only in "extraordinary circumstances." Judicial review of an OSHA decision not to regulate is "extremely narrow." Reversal of OSHA's decision here thus requires the exceptional to exist from both "substantive" and "judicial review" perspectives. At the same time, however, as the *Public Citizen* court observed, § 6(c) is mandatory in nature, and the " 'interests at stake are not merely economic interests in a license or a rate structure, but personal interests in life and health'." *Public Citi-*

zen, *supra,* 702 F.2d at 1156 (quoting *Wellford v. Ruckelshaus,* 439 F.2d 598, 601 (D.C.Cir.1971)). Moreover, the very narrow standard of review does not exempt OSHA from satisfying the "fundamental principle of reasoned explanation" of its action. *See infra* at 14–15.

### C. *Application of the Standard*

There is a threshold question that must be answered before that narrow standard of review is applied: whether the Court, some three years after the petition was filed, should even engage in review. Consideration of several factors stemming from the statutory framework and from the posture of this case suggests that reappraisal by the agency is the better course.

Section 6(c) is temporal in nature. An ETS takes effect "immediately," but lasts only six months. ETS proceedings are exempted from time-consuming rulemaking requirements. The "grave danger" and "necessity" findings must be based on evidence of *actual,* prevailing industrial conditions, *i.e.,* current levels of employee exposure to the substance in question. *See Public Citizen, supra,* 702 F.2d at 1156–57; *Florida Peach Growers, supra,* 486 F.2d at 130. It is, after all, an *"emergency"* measure.

**2.** The *Asbestos Information Ass'n* court's description of the record before it is equally applicable here:

"The record fills nine large boxes, and contains years' worth of accumulated asbestos reports and studies from all over the world. It also includes mathematical and statistical computations, and letters and memoranda to, from and between government agencies." 727 F.2d at 421.

The record in this case is troublesome for reasons beyond its bulk. Much of the delay here is attributable to repeated disputes about the contents of "the record" before the agency in early 1982. Plaintiffs' efforts to determine the documentary basis of OSHA's action began with a Freedom of Information Act request to OSHA for formaldehyde-related materials, continued with a series of (contested) discovery requests, and culminated with this Court's order that OSHA promptly respond to interrogatories and document requests "which deal with materials relied upon, directly or indirectly, by agency officials." (*See* Order entered March 24, 1983.)

Finally, on February 17, 1984, OSHA provided the Court with the "administrative record," seven binders that represent a "reconstruct[ion of] the state of [OSHA's] information as it existed on the decision date, January 29, 1982." Def. Resp.Interr. 37. The parties continue to dispute the accuracy of that reconstruction; of particular note is plaintiffs' contention that the Yurachek risk assessment (R.444) "was not even created" until one week after OSHA denied the petition. *Compare* Plts.Stmt.Mat.Facts 9–S *with* Def.Resp.Interr. 41 *and* Def.Opp.Plts.Mo.S.J. at 11–12 n. 9.

While these questions are no doubt relevant to the issue of whether OSHA acted properly in January 1982, continued attention to them detracts from the essential issue: whether workplace formaldehyde exposures should be the subject of emergency federal action in June of 1984. As noted below, the Court believes that agency evaluation of the record as it exists *today* best furthers the statutory design. *See infra* at 751–752.

In contrast, litigation—particularly *this* litigation—is historical in nature; judicial review is based on "the record" before the agency *at the time* of its decision. The UAW filed its petition in 1981. OSHA denied it in 1982. This is 1984. It is difficult to see how the statutory scheme would be advanced by either a judicial order compelling OSHA to issue an ETS or a judicial blessing of OSHA's two-page denial. The relief sought is entirely prospective. A judicially-declared "emergency" standard would be in effect from June to December 1984, yet be based on a record as it (may have) existed as of January 1982. This is an inescapable situation, given the age of this case and the rules of administrative law. At the same time, however, delay and doctrine should not allow OSHA to sidestep the serious questions posed by employee exposure to formaldehyde, nor avoid its obligation to adequately explain its actions.

In many respects, those questions are now better subject to thorough and expeditious review by the agency. Unlike early 1982, the evidence is collected and criticized. There are now no doubts regarding the "existence" of any materials in the record. Moreover, as a result of this litigation and other regulatory developments,[3] the issues surrounding formaldehyde regulation are sharply presented.

For example, in late 1983 (after briefing in this case closed), the National Center for Toxicological Research ("NCTR") sponsored a Consensus Workshop on Formaldehyde, which addressed the issues presented here and issued draft reports on numerous aspects of formaldehyde regulation. *See* NCTR, Report on the Consensus Workshop on Formaldehyde (filed by defendant, June 25, 1984). The EPA reviewed these reports

**3.** As defendant observes, several federal agencies regulate formaldehyde. *See* Def.Pts.Auth. Mo.S.J. at 8 n. 13. Two recent developments involving the Consumer Product Safety Commission and the Environmental Protection Agency are noteworthy. In April 1983 the Court of Appeals for the Fifth Circuit set aside the CPSC's ban on the use of urea-formaldehyde foam insulation in schools and residences. *Gulf South Industries v. CPSC, supra,* 701 F.2d [1137] at 1150. The Court was particularly critical of CPSC's "exclusive reliance on the [CIIT] study" in its risk assessment. *Id.* at 1146. The Court also expressed skepticism about two of the methodological "assumptions" incorporated into the risk assessment, *id.* at 1147 & n. 19, arguments advanced by the intervenor here.

More recently, the EPA announced that it regards formaldehyde as a "potential carcinogen in humans when inhaled" and would reconsider regulating exposures under § 4(f) of the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq. See* 49 Fed.Reg. 21870, 21892 (May 23, 1984). The EPA decision is noteworthy in several respects. First, the EPA evaluated the same animal bioassay and epidemiological evidence presented here. Second, EPA complied data regarding prevailing levels of formaldehyde exposure in a variety of settings. Third, EPA's decision to reconsider an earlier contrary decision was based in part on the "public controversy" that determination produced:

"Reconsideration of EPA's formaldehyde section (f) decision was dictated by public controversy that called into question the objectivity of EPA's scientific analysis and policy decisions. A number of questions were raised

regarding EPA's adherence to its own cancer policy guidelines. Meetings were held with selected members of the public, which appeared to some persons to be inappropriate. When such questions are raised about EPA's procedures and policies, it is incumbent on the Agency to rectify the situation. Rather than contribute further to the public controversy, EPA decided to remove any appearance to taint in its decision and submit the entire formaldehyde section 4(f) process to a public administrative forum." *Id.* at 21873.

Fourth and finally, the Toxic Substances Control Act requires EPA to "consult and coordinate" with other agencies involved in toxic substance regulation. *See* 15 U.S.C. § 2608(d). As EPA observed, the Act also permits the agency "if appropriate [to] refer some, or all, aspects of regulation of such risks to other federal agencies." 49 Fed.Reg. at 21895 (discussing 15 U.S.C. § 2068(a)). EPA noted that OSHA "has not initiated any recent regulatory investigation of formaldehyde," and referred to this case. *Id.*

All of these considerations support remand. Both the Fifth Circuit and EPA evaluations of the evidence and of risk assessment techniques contribute to the pool of information available to OSHA. The Toxic Substances Control Act and common sense dictate that the concerned agencies "work together" when regulation of possibly carcinogenic substances is contemplated. Remand at this time is particularly appropriate in view of the renewed interest in formaldehyde at EPA. Finally, remand affords OSHA an opportunity to dispel the "public controversy" surrounding its original ETS decision, a factor EPA found sufficient to support reconsideration of its earlier formaldehyde decision.

in making its recent formaldehyde decision (*see supra* note 3), and the reports are available to OSHA. The courts striking down § 6(c) standards in the past expressed concern about a lack of "public scrutiny" of the relevant facts and methodology. *See, e.g., Asbestos Information Ass'n, supra,* 727 F.2d at 426; *Dry Color Manufacturers, supra,* 486 F.2d at 104–05 n. 9a. In this case there of course has been no APA notice-and-comment period, but there is little doubt that representatives of employees and industry, in a variety of forums, have "scrutinized" the materials, and brought their concerns to the attention of the agency. Furthermore, both the OSH Act and OSHA's general Cancer Policy (*see infra* note 4) require that the agency act on the "best available evidence." Surely the statutory purpose is better served by initial agency review of all *current* data and analyses, rather than by judicial review of a record as it existed over two years ago.

Remand is also appropriate in view of OSHA's rather brief explanation of its denial. It is a commonplace of administrative law that the "validity of an agency's determinations must be judged on the basis of the agency's stated reasons for making that determination." *API, supra,* 448 U.S. at 631 n. 31, 100 S.Ct. at 2858 n. 31. The agency "must articulate a satisfactory explanation for its action," *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual,* 463 U.S. 29, ——, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), even where the challenged action is the informal matter of a refusal to issue a rule. *See Professional Drivers Council, supra,* 706 F.2d at 1221; *Natural Resources Defense Council, supra,* 606 F.2d at 1053; *Action for Children's Television v. FCC,* 564 F.2d 458, 472 n. 24 (D.C.Cir.1977). *Cf. Dry Color Manufacturers Ass'n, supra,* 486 F.2d at 106.

Defendant's February 1982 letter of denial is no model of agency explanation; indeed, its deficiencies are directly related to the delay in this case (*see supra* note 2). The letter did not state that OSHA "assumed," for purposes of the petition, that formaldehyde was a human carcinogen.

The letter did not identify the risk assessments it referenced, nor did it identify the agency's evidence of other "occupational risks." Nor did the letter seek to distinguish one industry from another. Nor did it make reference to any of the human epidemiological studies in the record. Although the agency should not be required to reinvent the wheel whenever it denies an ETS petition, it must at minimum meet the requirements of the "fundamental requirement of reasoned explanation," including adequately "informing the aggrieved person of the grounds of the administrative action." *Matlovich v. Secretary of the Air Force,* 591 F.2d 852, 857 (D.C.Cir.1978). The history of this petition and litigation belies the contention that the January 1982 letter met that standard.

In summary, the Court believes that further agency review is appropriate. OSHA should review all current scientific data, and it should review all of its regulatory options, including permanent rulemaking under § 6(b). The Court is *not* ordering OSHA to issue a permanent rule, nor is it even ordering the agency to immediately initiate rulemaking proceedings. The Court *is* directing the agency 1) to reconsider its denial of plaintiffs' ETS petition; and 2) to treat that petition as a "petition for the promulgation, modification, or revocation of a [permanent] standard" within the meaning of 29 C.F.R. § 1911.3. In so doing, the Court recognizes the very limited range of judicial action in this type of case; at the same time, it serves to remind OSHA of its duty to thoroughly and openly discharge its statutory obligation: "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions..." *American Textile Mfrs. Institute v. Donovan,* 452 U.S. 490, 493, 101 S.Ct. 2478, 2482, 69 L.Ed.2d 185 (1981) (quoting 29 U.S.C. § 651(b)).

### D. Standards on Remand

Plaintiff's ETS petition, as noted, was premised on evidence that formaldehyde may pose a "cancer risk to humans." The legal standards governing OSHA's response to such a petition derive from three

sources: Section 6(c) of the Act; the Supreme Court's decision in *API;* and Part 1990 of Title 29 of the Code of Federal Regulations (*Identification, Classification, and Regulation of Potential Occupational Carcinogens*) (the "Cancer Policy").[4] The interplay of these authorities has engendered considerable dispute in this matter, and should be resolved for purposes of the remand.

The provisions of § 6(c) and the Cancer Policy are outlined above. In *API,* the Supreme Court reviewed a permanent standard issued under 6(b)(5). The Court held that § 3(8), which defines "occupational health and safety standard," requires OSHA to make a "threshold determination" that permanent rulemaking is "reasonably necessary and appropriate to remedy a *significant risk* of material health

---

4. OSHA's Cancer Policy "establishes the criteria and procedures under which substances will be regulated by OSHA as potential occupational carcinogens." 29 C.F.R. § 1990.111(a). In brief, the Cancer Policy sets out general principles governing agency evaluation of scientific research; for example, § 1990.143(g) provides that positive results in high-dosage animal tests "will be used to establish the qualitative inference of carcinogenic hazard to workers." Prior to *API* the Policy also addressed ETS determinations: "employee exposure to Category I Potential Carcinogens constitutes a 'grave danger' within the meaning of section 6(c) of the Act." 45 Fed.Reg. 5100, 5286 (January 22, 1980). Following *API,* OSHA deleted that language, observing that "qualitative evidence of carcinogenicity must [now] be accompanied by consideration of the gravity of the danger...." 46 Fed.Reg. 4889, 4891 (January 19, 1981). The agency also limited applicability of the research evaluation principles to "identification" and "classification" but not to "regulation" of carcinogens, to "indicate that evidence not meeting the quality criteria will nonetheless be considered for purposes of assessing the significance of the risk." *Id.* See also 47 Fed.Reg. 188–189 (January 5, 1982). The Policy's current provision on temporary standards states only that OSHA may issue an ETS "in accordance with section 6(c) of the Act." 29 C.F.R. § 1990.141(b)(1).

The Court takes note of this regulatory history because of the confusion surrounding the Policy's applicability in this case. From the outset, plaintiffs and others alleged that OSHA "failed to follow its own regulations" in disposing of the formaldehyde petition. *See, e.g.,* Letter from Franklin E. Mirer to Thorne Auchter (February 9, 1982) (UAW response to OSHA's denial of petition); Plts.Pts.Auth.S.J. at 19–23; Ashford, *et al, A Hard Look at Federal Regulation of Formaldehyde: A departure from Reasoned Decisionmaking,* 7 Harv.Env.L.Rev. 297, 351–52 & nn. 367–70 (1983). OSHA's responses to plaintiffs' discovery requests about the Policy are uniform: "[s]ince OSHA assumed the carcinogenicity of formaldehyde in humans, the Cancer Policy Standard dealing with the qualitative identification of human carcinogens is *irrelevant* to this litigation." Def.Resp.Interr. 14 (emphasis supplied). Similarly, the intervenor emphasizes the Policy's post-*API* severance of "regulation" from "identification" and "classifica-

tion." *See, e.g.,* Intv.Brief.Supp.Def.Mo.S.J. at 21–24.

The implications of all this for further proceedings are unclear. With respect to the permanent rulemaking issue, OSHA of course must adhere to its own regulations regarding the identification and classification of formaldehyde as a potential occupational carcinogen. But the Policy is essentially silent with respect to ETS determinations. The Policy no longer defines "grave danger," and it does not require OSHA to "act" under § 6(c) even if it determines that formaldehyde is a potential human carcinogen. Nor does it require OSHA to incorporate the "identification assumptions" of § 1990.143 into the agency's risk assessment model. *But cf. Ashford, supra,* 7 Harv.Env.L.Rev. at 352 n. 368.

In many respects the controversy surrounding formaldehyde regulation reflects the controversy surrounding risk assessment itself. The intervenor in every forum emphasizes the "limited probative value of these models" and attacks the assumptions employed. *See, e.g.,* Intv.Brief. Supp.Def.Mo.S.J. at 24–40; *Gulf South, supra,* 701 F.2d at 1147 & n. 19. Plaintiffs "believe that reliance on quantitative risk assessment techniques in determining acceptable levels of carcinogenic risk among workers is inappropriate." Plts.Pts.Auth.Mo.S.J. at 28. OSHA itself sought public comment on the "techniques" and "reliability" of risk assessment, and the "value of incorporating guidelines on these matters into the [Cancer Policy]." 47 Fed.Reg. 187, 189 (January 5, 1982). Finally, appellate courts have been particularly skeptical about agency reliance on risk assessment analysis. *See, e.g., Asbestos Information Ass'n, supra,* 727 F.2d at 425–26; *Gulf South, supra,* 701 F.2d at 1147.

This of course is not the forum in which to resolve the difficult questions posed by agency reliance on risk assessment techniques. The very existence of a continuing debate, marked most recently by the statements of the Consensus Workshop and the EPA, and rulings of the Fifth Circuit, illustrate why remand is appropriate here. As suggested above (*see supra* note 3), these developments further illuminate the issues, and, like this litigation, offer the sort of "public scrutiny" the Fifth Circuit found particularly important with respect to agency reliance on risk assessment techniques. *See Asbestos Information Ass'n, supra,* 727 F.2d at 426.

impairment." *API, supra,* 448 U.S. at 639, 100 S.Ct. at 2862 (emphasis supplied). The Court had no occasion to discuss the "threshold determination," if any, required before OSHA issues an ETS, but the Court made this observation about § 6(c) in a much mooted footnote:

> "The structure of the separate subsection describing emergency temporary standards, 29 U.S.C. § 655(c), quoted in n. 13, *supra,* supports this conclusion. It authorizes the Secretary to bypass the normal procedures for setting permanent standards if he makes two findings: (A) that employees are exposed to "grave danger" from exposure to toxic substances and (B) that an emergency standard is 'necessary' to protect the employees from that danger. Those findings are to be compared with those that are implicitly required by the definition of the permanent standard—(A) that there be a significant—as opposed to a ['grave']—risk, and (B) that additional regulation is 'reasonably necessary or appropriate'—as opposed to "necessary." It would be anomalous for Congress to require specific findings for temporary standards but to give the Secretary a *carte blanche* for permanent standards." *Id.* at 640 n. 45.

As the record in this case reveals, the *API* decision spawned a number of formulations of a new, "post-*API*" ETS inquiry, with the issue resolving itself to this: whether the "significant risk" test of *API* should be treated as a gloss on either the "grave danger" or "necessity" language of § 6(c), or as a separate requirement deriving exclusively from § 3(8)'s definition of "standard." Defendant adopts the former approach, arguing that the word "grave" in § 6(c) carries with it the *API* test:

> "The Supreme Court has made unmistakably clear that the 'significant risk' requirement for permanent standards *parallels* but does not itself constitute the test for risk justifying an emergency rule; that test, the Court specifically said, is whether there is a 'grave risk.'

*American Petroleum Institute, supra,* 448 U.S. at 640 n. 45 [100 S.Ct. at 2863 n. 45]. 'Grave' risk is plainly a much heavier burden than 'significant' risk. The Court's construction thus leaves no room for the union's attempt to relax the relevant test.

> "In this case, as noted, formaldehyde was *assumed* to pose a 'danger' to worker health, but the 'grave' aspect of the danger remained to be determined. A danger rises to the level of 'grave,' when, based on actual workplace conditions, employees are faced with a risk of contracting serious disease which is substantially greater than a 'significant risk'." Def.Opp.Pts.Mo.S.J. at 7–8. *See also* Def.Resp.Interr. 9; Def.Resp.Admiss. 24.

Plaintiffs take the opposite position:

> "The Secretary's further suggestion that the burden of demonstrating a significant risk under section 6(c) is higher than under section 6(b) must also fail. Since the significant risk requirement derives from section 3(8) of the Act, and section 3(8) applies equally to sections 6(b)(5) and 6(c), the significant risk finding required by section 3(8) also must apply equally to standards issued under either section 6(b) or 6(c). The only difference in the significant risk finding which finds support in the caselaw is that risk is measured at the existing exposure limit under section 6(b)(5) and at actual exposure levels under section 6(c)." Plts.Opp.Def.Mo.S.J. at 6.

The question is whether *API* requires OSHA, before issuing an ETS, to find that the suspect substance poses a "significant" (the same finding necessary under § 6(b)(5)) or a "grave" (a heavier burden) risk to employees.

The two post-*API* ETS cases do not resolve the question. The *Public Citizen* court noted the "significant risk of grave danger" from worker exposure to ethylene oxide, a phrase plaintiffs believe demonstrates that the Court viewed significant risk and grave danger as "separate legal

**756**

elements." *See* Plts.Opp. at 6 & n. 7. That appears to read too much into the Court's phrase-making, and in any event the Court certainly made no direct construction of the statute. *See Public Citizen, supra,* 702 F.2d at 1157.

In *Asbestos Information Ass'n,* the Fifth Circuit held an ETS invalid because the record did "not indicate that the risk the ETS seeks to eliminate is 'grave,' as OSHA itself has defined it...." 727 F.2d at 427. The Court appeared to treat the "risk" issue as part of the "grave danger" prong of § 6(c), but as in *Public Citizen,* did not squarely address the issue.

The Court concludes that defendant's approach is correct. The "grave risk" language of footnote 45 in *API* cannot be overlooked. The Supreme Court's apparent treatment of "risk" and "danger" as regulatory synonyms, despite having derived the significant risk test from § 3(8)'s definition of standard, seems to import the risk test into § 6(c) itself. The Court therefore concludes that on reconsideration of the ETS petition, OSHA must determine whether formaldehyde exposure poses a "grave risk" to employees.

*E.  Conclusion*

This is a case where a number of factors point to reconsideration by the agency. The statute looks to current research and current conditions. There is recent and comprehensive analysis of the scientific literature. Another agency with shared regulatory authority is exploring the matter. The agency's objectivity is drawn into question, and its original explanation is inadequate. The standard of judicial review in the ETS-denial setting is extraordinarily narrow. Finally, and importantly, the stakes for both employees and employers are very high.

Accordingly, the cross-motions for summary judgment are denied and the case is remanded to the agency for further proceedings consistent with this memorandum.