**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 28 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

PETER MAIER, P.E.;
INTERMOUNTAIN WATER
ALLIANCE; ATLANTIC STATES
LEGAL FOUNDATION; and KAY
HENRY,

      Petitioners,

v.

UNITED STATES ENVIRON-
MENTAL PROTECTION AGENCY;
CAROL BROWNER, Administrator,
United States Environmental
Protection Agency,

      Respondents.

No. 95-9525

---

APPEAL FROM THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
(D.J. No. 90-5-1-7-1299)

---

Matthew Gilbert Kenna, Durango, Colorado, for Petitioners.

Jon M. Lipshultz, Environmental Defense Section, Environment and Natural
Resources Division, U.S. Department of Justice (Lois J. Schiffer, Assistant
Attorney General, and Stephen J. Sweeney, Water Division, U.S. Environmental
Protection Agency, with him on the brief), Washington, D.C., for Respondents.

---

Before **SEYMOUR**, Chief Judge, **ALARCON**[*], and **LUCERO**, Circuit Judges.

_____

**SEYMOUR**, Chief Judge.

---

[*] The Honorable Arthur L. Alarcon, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

Appellants Peter Maier, the Intermountain Water Alliance, the Atlantic States Legal Foundation, the Utah Wilderness Association, and Kay Henry[1] petitioned the Environmental Protection Agency (EPA) to initiate rulemaking under the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1387. Mr. Maier contended that recent developments in municipal wastewater technology have rendered the EPA's regulations for secondary treatment inadequate, and therefore the EPA must promulgate new standards. The EPA denied the petition, and Mr. Maier appealed to this court. We affirm.

I.

A.

We start with an overview of the relevant statutory scheme. The CWA aims "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by reducing and eventually eliminating the discharge of pollutants. 33 U.S.C. § 1251(a), (a)(1). "[T]he basic structure of the [CWA] . . . translates Congress' broad goal of eliminating 'the discharge of pollutants into the navigable waters' into specific requirements that must be met by individual point sources." EPA v. National Crushed Stone Ass'n, 449 U.S. 64, 69 (1980)

---

[1] The Utah Wilderness Association was dismissed from this appeal. For simplicity's sake, we shall refer only to Mr. Maier as petitioner.

(quoting 33 U.S.C. § 1251(a)(1)) (citations omitted). A "point source" is defined as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The CWA prohibits the discharge of any pollutant from a point source unless that discharge complies with the CWA's requirements. 33 U.S.C. § 1311(a). Compliance can be achieved by obtaining a National Pollutant Discharge Elimination System (NPDES) permit, pursuant to 33 U.S.C. § 1342, which establishes technology-based controls and ensures compliance with state or federal water quality standards. 33 U.S.C. § 1311(b)(1)(C). These permits generally contain quantitative limits on the amounts of specified pollutants that may be discharged. See generally Oklahoma v. EPA, 908 F.2d 595, 597-98 (10th Cir. 1990), rev'd on other grounds sub nom., Arkansas v. Oklahoma, 503 U.S. 91 (1992).

The CWA mandates varying standards of technology-based treatment as the minimum requirement for different categories of point sources. 33 U.S.C. §§ 1311, 1314. Under section 1311, "effluent limitations for point sources, other than publicly owned treatment works [POTWs] . . . require the application of the best practicable control technology currently available as defined by the Administrator." Id. § 1311(b)(1)(A). By contrast, the same section requires "for publicly owned treatment works . . . effluent limitations based upon secondary

-4-

treatment."[2]  Id. § 1311(b)(1)(B).  The EPA may supplement the minimum

requirements by using individual permits to impose "any more stringent limitation

. . . necessary to meet water quality standards."  Id. § 1311(b)(1)(C).  When

Congress first enacted these provisions, it intended to phase in a requirement that

publicly owned treatment works utilize "best practicable waste treatment

technology," a stricter standard than secondary treatment.  33 U.S.C. §

1311(b)(2)(B) (1973); see also S. REP. NO. 92-414, at 43 (1972), reprinted in 1972

U.S.C.C.A.N. 3668, 3709 ("Publicly-owned treatment systems must meet the

secondary treatment requirement of Phase I and, in Phase II, the mandate requires

the best practicable treatment . . . .").  In 1981, however, Congress repealed this

general requirement and limited the stricter standard to federally-funded POTWs.

Municipal Wastewater Treatment Construction Grant Amendments of 1981, Pub.

L. No. 97-117, § 21(b), 95 Stat. 1623, 1632 (1981).

### B.

Secondary treatment, which is the basic requirement for all POTWs, is

principally concerned with removing biological pollutants which affect the

oxygen content of wastewater.  Healthy waters contain dissolved oxygen upon

---

[2] Secondary treatment generally refers to a process of physical and biological treatment of wastewater to remove pollutants which deplete the water's oxygen content and increase its acidity.  See generally City of Sarasota v. EPA, 813 F.2d 1106, 1108 n.7 (11th Cir. 1987); Natural Resources Defense Council, Inc. v. EPA, 790 F.2d 289, 293 n.2 (3d Cir. 1986).

which flora and fauna rely, but biological pollutants "demand" and consume this oxygen. The rate at which dissolved oxygen is consumed is measured by a parameter called "biochemical oxygen demand" (BOD). BOD actually measures the effect of two components of oxygen depletion which, with proper testing, can be disaggregated: CBOD and NOD.[3] The EPA's regulations for standard secondary treatment have always focused on BOD, and in particular on control of CBOD.[4]

___

[3] Carbonaceous biochemical oxygen demand (CBOD) quantifies "the amount of oxygen consumed by various microorganisms in metabolizing organic (carbon) matter in the wastewater," while nitrogenous biochemical oxygen demand (NOD) measures "the oxygen consumed by other types of bacteria . . . in converting ammonia to nitrite and then to nitrate, a process known as nitrification." Secondary Treatment Information, 48 Fed. Reg. 52,272, 52,274 (1983) (proposed Nov. 16, 1983). NOD can also be referred to as NBOD, as Mr. Maier does.

"Nutrients" are related to NOD, and refer to materials upon which certain bacteria feed. Oxygen is consumed when these bacteria respire, or when they die and other organisms use oxygen to consume them.

[4] Controlling CBOD has been the main goal of secondary municipal wastewater treatment both because CBOD is usually a much greater problem than NOD and because the development of technology to effectively address high levels of NOD has lagged behind that used to reduce CBOD. Secondary Treatment Information, 48 Fed. Reg. 52,272, 52,275 (1983) (proposed Nov. 16, 1983).

More than a decade ago, scientific commentators speculated as to whether NOD was meant to be controlled as a component of BOD. See rec. at 43 ("Although significant nitrification can occur in the $BOD_5$ test for secondary effluents, much debate centers on whether the 30-mg/L $BOD_5$ standard, as defined by EPA, was intended to include only carbonaceous oxidation, or also any nitrogenous oxidation that might be exerted in the $BOD_5$ test.").

Initially, the EPA required testing for BOD by a standard five-day test of overall BOD levels, the so-called $BOD_5$ test. See rec. at 121-22. But the EPA became concerned that the $BOD_5$ test produced erroneous indications of effluent quality. Secondary treatment with existing technology[5] under some operating conditions could lead to increased nitrification (NOD), and inflated $BOD_5$ values, despite producing effluent of better quality than facilities with lower $BOD_5$. Id.; Secondary Treatment Information, 48 Fed. Reg. 52,272, 52,275-6. In a 1984 rulemaking, the EPA addressed the problem by revising its regulations to allow the permitting authority to require facilities to employ a more specific measure of CBOD rather than the general test for BOD. See Secondary Treatment Regulation, 49 Fed. Reg. 36,986, 36,988-90, 36,998-99 (1984) (to be codified at 40 C.F.R. pt. 133). In effect, EPA recognized that NOD can constitute a significant component of BOD levels, but concluded that measuring NOD in some cases might distort rather than enhance accurate assessment of effluent quality.

During this rulemaking, commenting parties, including Mr. Maier, suggested that secondary treatment standards ought to directly address NOD or ultimate BOD.[6] See id. at 36,999; rec. at 297. The EPA concluded, however, that

---

[5] Standard secondary treatment did not include controls on NOD.

[6] CBOD levels tend to rise sharply and then plateau, while NOD levels increase at a slower rate. As a result, early testing for BOD (e.g., after five days) will accurately assess CBOD but will fail to measure the levels to which NOD

(continued...)

NOD levels were quite variable and were therefore inappropriate as a criterion for generally-applicable standards. The EPA maintained that NOD would be better dealt with on a case-by-case basis in NPDES permitting. Secondary Treatment Regulation, 49 Fed. Reg. at 36,999; rec. at 297-98. The EPA therefore characterized NOD controls as a form of "advance treatment" to be imposed by permit where necessary. The EPA also noted that total impact on dissolved oxygen level (ultimate BOD) is to be considered in the NPDES permitting process. Secondary Treatment Regulation, 49 Fed. Reg. at 36,999. The EPA's 1984 rulemaking was not appealed to the federal courts. Thus, current regulations for secondary treatment do not establish standards for NOD, although an individual facility's NPDES permit may well impose requirements for NOD.

In 1993, Mr. Maier filed a petition requesting the EPA to initiate rulemaking to set parameters for NOD and ultimate BOD as part of its secondary treatment regulations. Mr. Maier argued that the existing regulations, setting parameters only for CBOD and $BOD_5$, were inadequate because new secondary treatment technology made it feasible and cost-effective to control both CBOD and NOD. The EPA did not controvert that controlling NOD was now feasible

[6](...continued)
will eventually rise. This rise in NOD would be captured by the measurement of ultimate BOD. This disparity has apparently been recognized for several decades, see rec. at 21, 51, but Mr. Maier suggests it was ignored when EPA promulgated regulations under the CWA, see id. at 8; see also id. at 244.

-8-

and cost-effective for some (but not all) POTWs, but emphasized that the impact of NOD is highly variable and dependent upon such factors as temperature and rate of flow of the receiving water body. In the EPA's view, this variability continues to justify its regulatory decision to control CBOD with a generally-applicable regulation, but to control NOD on a case-by-case basis through the permitting process. Consequently, the EPA denied Mr. Maier's petition. Mr. Maier filed the instant petition for review in this Court pursuant to 33 U.S.C. § 1369(b)(1).

II.

We first determine whether we have jurisdiction. Although both parties agree that we have jurisdiction, "no action of the parties can confer subject-matter jurisdiction upon a federal court." Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982). We have an independent duty to examine our own jurisdiction. Lopez v. Behles, 14 F.3d 1497, 1499 (10th Cir.), cert. denied, 115 S. Ct. 77 (1994).

The CWA establishes a bifurcated system of judicial review. Section 1365 "confers jurisdiction on the federal district courts, not courts of appeal, to review any action 'where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator.'"

Trustees for Alaska v. EPA, 749 F.2d 549, 558 (9th Cir. 1984) (quoting 33 U.S.C. § 1365(a)(2)). Section 1369 of the CWA provides that "[r]eview of the Administrator's action . . . (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title . . . may be had by any interested person in the Circuit Court of Appeals of the United States." 33 U.S.C. § 1369(b)(1).[7] The jurisdictional grant in section 1369 is exclusive. American Petroleum Inst. v. Train, 526 F.2d 1343, 1344 (10th Cir. 1975). We must determine whether the EPA's denial of Maier's petition to institute rulemaking constitutes an "action . . . in approving or promulgating any effluent limitation or other limitation," and thus falls within the ambit of section 1369(b)(1).

The District of Columbia Circuit dealt with a similar problem in Oljato Chapter of Navajo Tribe v. Train, 515 F.2d 654 (D.C. Cir. 1975), which interpreted jurisdictional provisions of the Clean Air Act (CAA) in the context of the EPA's refusal to revise previously promulgated standards for certain power plants. As in the CWA, the CAA contained one section permitting citizen suits to be brought in federal district court, id. at 657-58 n.4 (citing CAA § 304, 42 U.S.C.A. § 1857h-2(a) & (b) (1970)), and another granting jurisdiction to the

_____

[7] Section 1369 codifies Section 509 of the Federal Water Pollution Control Act (Clean Water Act) of 1972.

courts of appeal to "review of action of the Administrator in promulgating" standards of performance, id. at 657 n.3 (quoting CAA § 307(b), 42 U.S.C.A. § 1857h-5(b) (1975 pocket part)). The petitioners in Oljato Chapter argued that an EPA standard had been rendered obsolete by changes in technology, and that the Administrator's failure to revise the rule "constituted a failure to perform a nondiscretionary duty, thereby conferring District Court jurisdiction." Id. at 658. The court rejected petitioners' attempts to distinguish "between judicial review of an original rule and review of a subsequent refusal to modify or reverse that rule," noting that

> [w]hile we have no difficulty in making the suggested distinction, we conclude that Congress intended all review related to the continuing validity of standards of performance to be included within the exclusive scope of [the section providing for appellate review]; that this action is premised upon the Administrator's refusal to revise the standard is of no jurisdictional import.

Id. at 659-60. Oljato Chapter relied both on the CAA's legislative history, and on the fact that

> [s]ince a revision by the Administrator is the ultimate goal of a new information appeal, it makes little sense to suggest that this court is stripped of its . . . jurisdiction whenever a party attempts to avoid litigation by first asking the Administrator voluntarily to make the same revision a successful . . . petition would require.

Id. at 660.

-11-

As was the case in <u>Oljato Chapter</u>, the legislative history of the CWA speaks directly to the case at hand:

> The Committee recognizes that it would not be in the public interest to measure for all time the adequacy of a promulgation of any standard requirement or regulation by the information available at the time of such promulgation. In the area of protection of public health and environmental quality, it is clear that new information will be developed and that such information may dictate a revision or modification of any promulgated standard, requirement, or regulation established under the act. The judicial review section, therefore, provides that any person may challenge any requirement after the date of promulgation whenever it is alleged that significant new information has become available.

S. REP. NO. 92-414, at 85 (1972), <u>reprinted in</u> 1972 U.S.C.C.A.N. 3668, 3751. Congress plainly intended that the Administrator's refusal to institute rulemaking in the face of new information could be reviewed directly in a circuit court.

Section 1369's language about an Administrator's "action . . . in approving or promulgating any . . . limitation" arguably does not apply to the Administrator's refusal to promulgate a rule in the first instance. We agree with the court in <u>Oljato Chapter</u>, however, that a challenge to the refusal to revise a rule in the face of new information is more akin to a challenge to the existing rule than a challenge to the refusal to promulgate a new rule.[8] Because Mr. Maier is

---

[8] We note that two courts have eschewed jurisdiction under section 1369; however, neither case involved the continuing validity of a rule in the face of new information. In <u>Bethlehem Steel Corp. v. EPA</u>, 782 F.2d 645, 656 (7th Cir.

(continued...)

-12-

essentially challenging the sufficiency of the EPA's secondary treatment regulation, we have no difficulty construing this as a challenge to an "action in approving or promulgating" under section 1369. Where petitioners' challenge is to the substance of a regulation that the agency has already promulgated, exclusive jurisdiction in the court of appeals may not be evaded merely by styling the claim as one for failure to revise. Cf. DAVID P. CURRIE, AIR POLLUTION: FEDERAL LAW AND ANALYSIS § 9.10, at 9-31 (1981) ("In short, allegations that the Administrator has failed to take action required by statute should not be permitted to circumvent the plain statutory command that judicial review of decisions respecting implementation plans and other regulations is to be in the courts of appeals . . . ."). "Absent a far clearer expression of congressional intent, we are unwilling to read the CWA as creating such a seemingly irrational bifurcated system." Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 196-97

---

[8](...continued)
1986), the remedy sought was "not to rescind or modify" as a result of new information, but rather "to conduct a new, follow-on rulemaking proceeding . . . distinct from that which [was] under review." Likewise, in Natural Resources Defense Council, Inc. v. Train, 519 F.2d 287, 291 (D.C. Cir. 1975), review was sought for "the omission of certain substances" and "[u]nless a substance is listed no standard or prohibition reviewable under section [1369] will ever be promulgated." We also note that review was not possible because neither case had a complete administrative record. Bethlehem Steel, 782 F.2d at 655-56 (review "will require the compilation of a new administrative record"); Natural Resources Defense Council, Inc. v. Train, 519 F.2d at 291 ("[T]he Administrator had not filed the entire administrative record with the court.").

(1980) (rejecting attempt to distinguish challenge to EPA veto of a state permit from a challenge to EPA issuance of a permit).

Moreover, if the EPA had responded to Mr. Maier's petition by promulgating a revised rule, exclusive jurisdiction for review would lie in the Court of Appeals. The fact that the EPA declined to act does not deprive us of jurisdiction, for we have exclusive jurisdiction over "petitions to compel final agency action which would only be reviewable in the United States Courts of Appeal." See Environmental Defense Fund v. NRC, 902 F.2d 785, 786 (10th Cir. 1990).[9] This rule ensures that an appellate court will review the Administrator's decision whether the ultimate challenge is to a failure to revise or to a decision to revise.[10] Because exclusive jurisdiction to review the substance of regulations finally promulgated by the EPA lies with the Courts of Appeals, we have jurisdiction to compel revisory rulemaking unless the agency's failure falls within

---

[9] Although the statutory scheme in Environmental Defense Fund v. NRC did not contain a bifurcated system of judicial review, that fact is irrelevant. The CWA confers jurisdiction on the district courts only for the failure to perform non-discretionary duties. Where the alleged duty is discretionary, as here, the courts of appeals have jurisdiction.

[10] Prudential concerns are not to the contrary, for "[u]nlike other actions in which the district court serves the important functions of developing a complete record and 'defining and focusing the issues,' in many appeals of administrative actions, the agency already has fulfilled those functions and there is no practical reason to submit the issues to two-tiered judicial review." 2 STEVEN ALAN CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 14.03, at 14-19 (2d ed. 1992) (citation omitted).

that class of nondiscretionary duties for which jurisdiction has been granted to the district court.

This is not a case which could have been brought in district court as a citizen's suit under section 1365. Such a suit may lie only for failure to perform a nondiscretionary duty. 33 U.S.C. § 1365. The instant case is unlike others in which circuit courts have declined to find section 1369 jurisdiction in the face of the EPA's refusal to promulgate regulations at all, or its failure to do so by a date certain set by law. For example, in Trustees for Alaska the Ninth Circuit considered a claim that the EPA had totally failed to promulgate specific regulations for the placer mining industry notwithstanding a requirement from Congress to do so, and was instead setting effluent limitations in individual NPDES permits. Trustees for Alaska, 749 F.2d at 558. The court determined that this claim was "framed in terms of the EPA's failure to comply with a nondiscretionary duty to promulgate industry-wide rules," id., and was therefore required to be brought in district court under section 1365, id. at 558-59. See also Armco, Inc. v. EPA, 869 F.2d 975, 981-82 (6th Cir. 1989) (disclaiming jurisdiction where EPA had refused to perform nondiscretionary responsibility to propose comprehensive sludge management regulations); Pennsylvania Dep't of Envtl. Resources v. EPA, 618 F.2d 991, 995 (3d Cir. 1980) (declining section 1369 jurisdiction over suits to compel EPA to perform nondiscretionary duty to

-15-

promulgate new source performance standards applicable to post-mining

discharges).  In these cases, the EPA had failed to issue the disputed regulations

at all.  In the instant case, the EPA has both issued and revised its regulations, but

Mr. Maier contends it has abused its discretion by declining to initiate rulemaking

again in light of new information.  Both parties agree that the timing of any

revision is discretionary.[11]  Mr. Maier does not contend the EPA has failed to

comply with a nondiscretionary duty, and thus a district court could not exercise

jurisdiction over his claim under section 1365.[12]  We therefore hold that we have

jurisdiction over the instant case under section 1369.

III.

A.

---

[11] We note the dicta in Oljato Chapter that a duty under the CAA to revise regulations "from time to time" is discretionary was rendered obsolete by statutory revision imposing a mandatory duty to review regulations every five years.  See Environmental Defense Fund v. Thomas, 870 F.2d 892, 896-97 (2d Cir. 1989).

[12] As the court in Oljato Chapter noted, the limited jurisdiction granted to the district court would be rendered boundless if an abuse of discretion were considered to be a "failure to perform a nondiscretionary act."  515 F.2d at 662 (emphasis added).

-16-

We review an agency's refusal to initiate revisory rulemaking to determine if the agency's refusal was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Oklahoma v. EPA, 908 F.2d 595, 598 (10th Cir. 1990), rev'd on other grounds sub nom. Arkansas v. Oklahoma, 503 U.S. 91 (1992). Although our inquiry into the basis of the agency's action will be searching and careful, our review is ultimately a narrow one. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Review under the "arbitrary and capricious" standard "encompasses a range of levels of deference to the agency." American Horse Protection Ass'n v. Lyng, 812 F.2d 1, 4 (D.C. Cir. 1987) (AHPA) (citing WWHT, Inc. v. FCC, 656 F.2d 807, 817 (D.C. Cir. 1981)); accord Brown v. Secretary of Health and Human Servs., 46 F.3d 102, 110 (1st Cir. 1995). In determining the appropriate level of deference, we heed the nature and context of the challenged agency action or inaction.[13]

---

[13] In Heckler v. Chaney, 470 U.S. 821, 831 (1985), the Supreme Court decided that agency refusals to take specific enforcement actions are presumptively unreviewable under the APA. However, the Court expressly did not address the level of deference due when the agency refuses to initiate rulemaking. Id. at 825 n.2. The D.C. Circuit has held that the Chaney presumption does not apply to refusals to initiate rulemaking. AHPA, 812 F.2d at 4-5. See also Cass R. Sunstein, *Reviewing Agency Inaction After* Heckler v. Chaney, 52 U. CHI. L. REV. 653, 680-83 (1985). The EPA agrees that its refusal to initiate rulemaking is reviewable.

Substantial prudential concerns counsel particularly broad deference in the context of review of an agency refusal to initiate rulemaking. The D.C. Circuit has repeatedly observed that, within the range of deference embodied in the "arbitrary and capricious" standard, refusals to initiate rulemaking are at the high end. See, e.g., Capital Network Sys., Inc. v. FCC, 3 F.3d 1526, 1530 (D.C. Cir. 1993) (quoting AHPA, 812 F.2d at 4-5; citing Cellnet Communications, Inc. v. FCC, 965 F.2d 1106, 1111 (D.C. Cir. 1992)). Courts are ill-equipped and poorly situated to address important reasons for agency inaction, such as the decision that a "problem is not sufficiently important to justify the allocation of significant scarce resources given the nature of the many other problems the agency is attempting to address." 1 KENNETH C. DAVIS & RICHARD J. PIERCE, ADMINIS-TRATIVE LAW TREATISE § 6.9, at 280 (3d ed. 1994). "A court rarely has enough information to second guess agency decisions premised on this type of reasoning." Id.; see also Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1046 (D.C. Cir. 1979) ("An agency's discretionary decision *not* to regulate a given activity is inevitably based, in large measure, on factors not inherently susceptible to judicial resolution . . . ."); AHPA, 812 F.2d at 4-5 (according heightened deference to refusal to initiate rulemaking).

Nonetheless, we will not blindly uphold agency refusals to initiate rulemaking in the face of new information. "[C]hanges in factual and legal

circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so." Bechtel v. FCC, 957 F.2d 873, 881 (D.C. Cir. 1992). For example, "a refusal to initiate a rulemaking naturally sets off a special alert when a petition has sought a radical modification of a rule on the basis of a radical change in its factual premises." AHPA, 812 F.2d at 5. Thus, the D.C. Circuit has held "that an agency may be forced by a reviewing court to institute rulemaking proceedings if a significant factual predicate of a prior decision on the subject (either to promulgate or not to promulgate specific rules) has been removed." WWHT, 656 F.2d at 819 (describing Geller v. FCC, 610 F.2d 973 (D.C. Cir. 1979)).

An agency determination may also be vulnerable to challenge if it rests on an insufficient legal predicate. Where the agency's refusal to initiate rulemaking implicates questions of statutory interpretation, we use the familiar Chevron test. When we review an agency's interpretation of a statute it administers, we ask two questions. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). But "if the statute is silent or ambiguous with respect to the specific issue, the question for

the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. If Congress has explicitly or implicitly delegated authority to an agency, "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844. "This deference is a product both of an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time." International Bhd. of Teamsters v. Daniel, 439 U.S. 551, 566 n.20 (1979).

B.

Mr. Maier asserts here that the existence of new technology mandates revision of the regulations governing publicly owned treatment works. The EPA does not controvert that NOD can now be controlled effectively. The central question on appeal is whether such control must be accomplished through the EPA's generally-applicable standards for secondary treatment, or whether the EPA may continue to address the problem on a case-by-case basis through the permit process.[14]

---

[14] In his initial appellate brief, Mr. Maier also argued that the EPA must amend its regulations to replace testing for oxygen depletion after five days

(continued...)

Mr. Maier argues that the EPA's refusal to initiate rulemaking is arbitrary and capricious because the development of the new technology has removed both the legal and factual predicate of the EPA's decision not to set parameters for NOD.  Mr. Maier asserts that because the CWA is a "technology-forcing" statute, the development of cost-effective new technology must be incorporated into the EPA's generally-applicable secondary treatment regulations.  Alternatively, he argues that even if the statute gives the EPA discretion to address NOD levels by permit, its decision to do so in this instance is not supported by the evidence before the agency or is based on the consideration of impermissible factors.  Although there is substantial overlap between these arguments, we consider them in turn.

Under Chevron's first step, we ask "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  Section 1311 of the CWA specifies:

> (a) Except as in compliance with this [and other] sections . . . the discharge of any pollutant by any person shall be unlawful.
> (b) In order to carry out the objective of this chapter there shall be achieved--
> . . . .

---

[14](...continued)
(BOD$_5$) with testing for ultimate oxygen depletion.  In his reply brief, Mr. Maier concedes that this argument cannot stand alone and is founded on his argument about the need to set general parameters for NOD.

(1)(B) for publicly owned treatment works . . ., effluent limitations based upon <u>secondary treatment as defined by the Administrator</u> pursuant to section 1314(d)(1) of this title . . . .

33 U.S.C. § 1311 (emphasis added). In turn, section 1314(d) provides that "[t]he Administrator . . . shall publish within sixty days after October 18, 1972 (and from time to time thereafter) information, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, on the degree of effluent reduction attainable through the application of secondary treatment." <u>Id.</u> § 1314(d)(1). Aside from sections 1311 and 1314, the CWA does not further delimit "secondary treatment," or specifically constrain the Administrator in promulgating generally-applicable effluent limitations for POTWs.

Congress has not directly spoken to the precise question of whether the EPA has discretion to conclude that reductions in NOD are not required to be achieved by generally-applicable effluent limitations, but may instead be imposed by permit. The statute plainly delegates to the EPA authority to define secondary treatment, and to promulgate generally-applicable regulations based on its definition. We must therefore determine whether the EPA's secondary treatment regulations are a "permissible construction" of the CWA. Mr. Maier posits that the statutory definition of "secondary treatment" must include technology to reduce NOD and nutrients if such technology is available and cost-effective. He argues that the EPA's decision to control NOD by permit is not a legitimate

-22-

policy choice because the CWA requires the EPA to promulgate generally-applicable effluent limitations for every pollutant that can be controlled with "secondary treatment." We disagree and conclude that the EPA's secondary treatment regulations are a permissible exercise of its authority under sections 1311 and 1314.

As an initial matter, we must reject Mr. Maier's claim that § 1314(d)(1) requires the Administrator to publish secondary treatment regulations for any pollutant that can be controlled via secondary treatment. That provision plainly mandates only that the EPA issue scientific information "from time to time." Compare 33 U.S.C. § 1314(d)(1) ("The Administrator . . . shall publish . . . from time to time . . . information . . . on the degree of effluent reduction attainable through the application of secondary treatment."), with id. § 1314(b) ("the Administrator shall . . . publish . . . regulations."). While it is true that where reductions in NOD are "attainable through the application of secondary treatment," id. § 1314(d)(1), the EPA may have a present duty under § 1314(d)(1) to publish information pertaining to those reductions, cf. Oljato, 515 F.2d at 662, the EPA is not required under that same provision to issue regulations limiting NOD discharges from POTWs. Mr. Maier has not advanced a duty-to-publish claim in the instant case, and we therefore do not consider this question further.

As a matter of statutory delegation and practical necessity, the EPA exercises its expertise to determine if a given technology ought to form the basis of the standard "secondary treatment" defined under section 1314(d)(1). The phrase "secondary treatment" has an independent meaning apart from its statutory context. "Conventional or secondary treatment of municipal waste includes biological processes, primarily decomposition, with or without chemical disinfectants, to remove organic wastes." City of Sarasota, 813 F.2d at 1108 n.7. The phrase distinguishes one stage in a variegated treatment system:

> There are three levels of wastewater treatment. Primary treatment refers to a physical sedimentation process for removing settleable solids. Secondary treatment refers to a physical/biological process for removing solids and pollutants characterized by biological oxygen demand and pH. Tertiary treatment involves processes which remove other pollutants such as non-biodegradable toxics.

Natural Resources Defense Council, Inc. v. EPA, 790 F.2d at 293 n.2; see also California v. EPA, 689 F.2d 217, 218 (D.C. Cir. 1982) (distinguishing secondary treatment, advance secondary treatment, and advance waste treatment). Although these descriptions suggest that NOD and nutrients fall within a general understanding of secondary treatment, they also demonstrate "secondary treatment" has a broad connotation.

The legislative history of the CWA also offers little guidance to the statutory definition of "secondary treatment" with respect to NOD. The EPA

argues Congress intended that "secondary treatment" concern "organic" oxygen depletion, i.e., CBOD, but not NOD and nutrients. However, it is far from clear from the legislative history that this distinction was ever considered. As noted in the House Report, "[s]econdary treatment as considered in the context of a publicly owned treatment works is generally concerned with suspended solids and biologically degradable, oxygen demanding materials (BOD)." H. REP. NO. 92-911, at 101 (1972). It appears more likely that when the CWA was enacted, treatment for NOD simply was not technologically feasible. See, e.g., Secondary Treatment Regulation, 49 Fed. Reg. 36,986, 36,988 (1984) (to be codified at 40 C.F.R. pt. 133) ("Secondary treatment requirements are based on controlling the oxygen demand due to the carbonaceous component of the organic material in the effluent because secondary treatment facilities can effectively remove carbonaceous organic material . . . but may not consistently remove ammonia."); Secondary Treatment Information, 48 Fed. Reg. 52,272, 52,273 (1983) ("'[N]utrients . . . were not specified for inclusion, because secondary treatment, under normal conditions, does not effectively or consistently remove them.'") (citation omitted). Congress did not speak to the problem confronting us because for practical purposes it did not yet exist.

Given the broad category of treatment processes and technology encompassed by "secondary treatment," and statutory delegation to the

Administrator to define secondary treatment, we do not find it impermissible for the EPA to refuse to extend its definition of standard secondary treatment to include controls on NOD. The EPA has consistently classified NOD reduction as a form of "advanced treatment" that will be required by permit if necessary to protect water quality. See, e.g., Secondary Treatment Information, 48 Fed. Reg. 52,272, 52,275 (1983) (proposed Nov. 16, 1983) (describing nitrification processes as "beyond secondary" treatment). We do not agree with Mr. Maier or the dissent that technological feasibility is the only criterion the EPA may use to determine which of the universe of secondary treatment technologies ought to be considered standard. Here, the agency's choice is supported by its reasoned consideration of other factors that lie within its expertise in administering the statute.[15]

_____

[15]The dissent claims the EPA is foreclosed from exercising its discretion to exclude NOD from its definition of secondary treatment because the agency has used secondary treatment regulations to control BOD, of which NOD is a component. As our discussion in part I.B makes clear, however, BOD parameters have historically been set by the agency as a rough proxy for CBOD. At the time that the BOD limitations were first promulgated, control of the NOD component was not technologically feasible. As the dissent constantly reminds us, secondary treatment is technology-based. The BOD parameter was thus targeted at CBOD, for which reductions were technologically attainable, and not at NOD, for which reductions were not technologically attainable. By the time of the EPA's 1984 rulemaking, a nitrification-inhibited test was developed which allowed for the isolation of the CBOD component. The EPA promulgated regulations approving the use of the CBOD test in lieu of the general BOD test. The EPA has never set discrete limitations on the NOD component.

-26-

Section 1311(b)(1)(B), in conjunction with section 1314(d)(1), provides for the promulgation of generally-applicable effluent limitations for POTWs. Section 1311(b)(1)(B) gives the EPA authority to determine the stringency and scope of generally-applicable effluent limitations that are based on secondary treatment. Thus, even if reductions of NOD and nutrients potentially fall within the definition of "secondary treatment," the EPA must determine if it should promulgate generally-applicable effluent limitations for these specific pollutants. The statute requires that generally-applicable effluent limitations for POTWs be "based upon secondary treatment." 33 U.S.C. § 1311(b)(1)(B) (emphasis added). Contrary to Mr. Maier's assertion, the statute does not on its face require that the generally-applicable effluent limitations address all pollutants that might be reduced by secondary treatment.[16] When we apply the deference due an adminstrative agency which Chevron mandates, "[t]he permissive nature of the statute implies broad agency discretion in selecting the appropriate manner of regulation." Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983). EPA's position that the statute allows the agency to impose limits for NOD on a case-by-case basis through the permitting

---

[16]On its face, the CWA gives the EPA less discretion in setting effluent limitations on point sources other than POTWs. See 33 U.S.C. § 1311(b)(2)(A) (stating that for certain identified toxic pollutants "there shall be achieved . . . effluent limitations . . . which shall require the application of the best available technology economically achievable.").

process is a reasonable and permissible reading of the statute, to which we must defer.[17]

The EPA's exercise of its discretion under sections 1311 and 1314 is not in these circumstances arbitrary, capricious, or manifestly contrary to the statute. The EPA has made the uncontroverted claim that the effect of NOD is highly variable and site-specific, and thus not appropriate to a general regulation applicable to every POTW. Here, the EPA and the States approved to administer the NPDES permit program routinely impose NOD and nutrient limitations on POTWs on a case-by-case basis by permit. We are not faced with a situation in which the EPA has chosen to ignore a pollutant or category of pollutants for which effluent reductions are attainable by secondary treatment. The EPA has not substituted control by permit for control by generally-applicable effluent limitation without a reasoned explanation for its choice of method. Contrary to the dissent's suggestion, the EPA has not sought, nor do we approve, "general discretion to define secondary treatment to cover only those pollutants that are--in

---

[17]The dissent suggests that our analysis of section 1311 substitutes our own construction of the statute for that advanced by the agency. In so doing, the dissent fails to distinguish between the *source of* agency discretion, which we must determine in the first instance under <u>Chevron</u>, and the *basis for* the agency's *exercise of* its discretion, for which the dissent correctly observes we may not supply our own rationale. Moreover, we may not avoid construing the statute to the extent necessary to determine that the agency's regulations are not "manifestly contrary to the statute." <u>Chevron</u>, 467 U.S. at 844.

the view of the Administrator--more appropriately regulated via generally-applicable regulations rather than case-by-case quality-based limits." Dissent at 9. The EPA's discretion is not unbridled.

This brings us to Mr. Maier's second argument, which is that the EPA's refusal to include parameters for NOD and ultimate BOD in its secondary treatment regulations in this instance was nonetheless arbitrary and capricious because the refusal was not supported by the evidence and was based on a consideration of impermissible factors. The Supreme Court has stated

> an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983). The Court's statement is equally applicable to an agency's basis for declining to make a rule.

The EPA does not dispute that one factual predicate of the existing regulations has changed—the feasibility and cost-effectiveness of technology to control NOD. See WWHT, 656 F.2d at 819 ("[A]n agency may be forced by a reviewing court to institute rulemaking proceedings if a significant factual predicate of a prior decision on the subject . . . has been removed."). Mr. Maier argues that technological feasibility is the only criterion the EPA may use to

determine which secondary treatment controls ought to be generally applicable, and which may be imposed on a case-by-case basis. We disagree. The agency's decision to control NOD and nutrients by permit is supported by two other factual predicates that lie within its expertise in administering the statute: first, the impact of NOD and nutrients on water quality is highly variable with the characteristics of the receiving body of water; second, control of NOD by permit adequately protects water quality where necessary. Mr. Maier does not dispute these factual premises. Instead, he argues that the first is a legally impermissible consideration, and he explicitly eschews a challenge to the second.[18]

Mr. Maier observes Congress intended the effluent limitations in the CWA to be technology-based, not based on assessments of water quality. In general, we agree. See EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 204-05 (1976). However, effluent limitations for POTWs must be "based upon" secondary treatment technology, not co-extensive with it. We do not agree with Mr. Maier that it is impermissible for the EPA to consider effects on water quality in determining whether reductions attainable by new secondary treatment technology ought to be uniformly imposed on all POTWs. The purpose

---

[18]In his Reply Brief, Mr. Maier appends material pertaining to the effectiveness of the permitting process in protecting water quality from NOD. We decline to consider this material as it was not presented in the petition to the EPA for consideration by the agency.

of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters . . . ." 33 U.S.C. § 1251(a). The EPA relies on statutory language authorizing the EPA to use the permitting process to impose "more stringent limitation[s]" on POTWs where necessary to protect water quality. 33 U.S.C. § 1311(b)(1)(C). We need not determine if section 1311(b)(1)(C) directly authorizes the use of permitting as an alternative to, as opposed to a supplement for, generally-applicable effluent limitations.[19] The fact that Congress has, in this closely related statutory section, provided for quality-based permitting as a gap-filling measure gives strong support to the EPA's exercise of delegated authority to fill the gap where it has concluded that NOD should not be part of standard secondary treatment. The fact that secondary treatment controls are technology-based does not preclude the EPA from deciding that certain technologically-attainable standards are necessary and appropriate only for some POTWs. We should not order the agency to develop generally-applicable parameters based on the use of new technology, even if cost-effective, in the face of the agency's reasoned judgment that the use of such technology is irrelevant to the attainment of water quality standards in many circumstances.

---

[19]The dissent asserts that the "more stringent" permits described in section 1311(b)(1)(C) may only come into play where a generally-applicable regulation is not technologically feasible, or as a supplement when the generally-applicable regulation is inadequate to protect water quality.

Contrary to the suggestion of the dissent, we do not approve the EPA's regulations based on the agency's naked "policy preference for quality-based controls rather than generally applicable limitations." Dissent at 7. The EPA has articulated its uncontroverted view that NOD is highly variable with the conditions of the receiving body of water. Consequently, NOD is particularly unsuited for a generally applicable regulation, and is appropriately dealt with--and is being dealt with--by permit. We agree with the dissent that the Clean Water Act amendments created a statutory regime in which technology-based standards are the primary mechanism of controlling discharge of pollutants. It is a far stretch from this presumption to the conclusion that the EPA may not exercise its authority in filling the gaps to conclude that certain pollutants, due to their peculiar characteristics, need not be controlled by across-the-board standards. Contrary to the dissent's inference, we do not hold that the EPA may choose a permit-based approach over a technology-based standard merely based on the agency's "policy preference."

The dissent gives lip service to the notion of deference to the agency, but the deference it would give is cramped indeed. The dissent asserts that to satisfy Chevron, "the implementing agency must point to some language in the statute to justify its policy conclusion--here, that the POTW regulatory regime can legitimately depart from the core public policy of the Clean Water Act." Dissent

at 8-9. This turns the Chevron test on its head: the dissent, rather than deferring to the agency's gap-filling unless "manifestly contrary to the statute," imposes on the agency the burden of proving that its gap-filling is manifestly authorized by the statute--in which case it would be unnecessary to invoke the Chevron framework in the first instance. We are faced with a paradigmatic situation calling for deference to the agency: where the statute allows the agency to exercise discretion, we should defer to the agency's use of its expertise in striking a careful balance between the broad statutory purposes and the unique problems posed by specific pollutants and technologies. The EPA has offered a reasoned basis for its belief that this balance is to apply a technology-based standard to some, rather than all, POTWs.

Mr. Maier argues that, even if the EPA is right about the costs of retrofitting existing POTWs, new facilities can be designed to treat NOD at no greater expense and the EPA should so require. Even if this is true, we are not persuaded the EPA's failure to so act is arbitrary or capricious. The EPA maintains that NOD is adequately addressed on a plant-by-plant basis. Mr. Maier has failed to demonstrate that stricter standards in individual permits are not effective in promoting the building of these newer, more effective designs. Moreover, this argument ignores the real costs of administering environmental laws. Promulgating revised regulations necessitates a substantial commitment of

limited agency resources. We have "little ability to determine the resources available to the agency or to determine whether the other problems to which the agency has chosen to devote its scarce resources are more or less important than the problem raised in the petition." 1 DAVIS & PIERCE, ADMINISTRATIVE LAW TREATISE § 6.9, at 280.

On the record in this case, we cannot hold that the EPA's interpretation of the CWA is arbitrary or capricious, or that its rejection of rulemaking in this instance is arbitrary or capricious. Since the EPA first promulgated regulations under Section 1311, it has never required that all oxygen-depleting pollutants be removed by means of generally-applicable secondary treatment controls. These regulations do not stand alone; rather, they set a national floor for the performance of secondary treatment systems. Primary and tertiary treatments complement their function, and individual permits for treatment facilities can have stricter standards. EPA makes a reasoned argument that where NOD is a problem, it may be addressed in the terms of a POTW's permit, and points out that 53% of major secondary treatment facilities across the country now have such requirements. Rec. at 123. Mr. Maier would have to provide impressive evidence that the EPA has acted irrationally. He has not done so. Without a more convincing showing that the nation's municipal water treatment system is broken, we will not order the EPA to fix it.

-34-

**AFFIRMED.**

LUCERO, Circuit Judge, Concurring in part and dissenting in part

I join parts I, II, and IIIA of the majority's opinion, but must respectfully dissent from part IIIB. The majority concludes that the EPA's interpretation of the secondary treatment provisions is "permissible" and therefore valid under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). I cannot agree for two reasons. First, one "permissible" interpretation identified by the majority is not in fact advanced by the EPA. We cannot defer under Chevron to an agency construction when the agency has not construed the language at issue. Second, on this record, the EPA's construction of the term "secondary treatment" is not permissible. While the Clean Water Act ("CWA") gives the Administrator discretion to define secondary treatment pursuant to the statute, that discretion cannot be exercised in a manner inconsistent both with the structure and legislative history of the statute and with the Administrator's own prior interpretation of the term. In allowing the substitution of quality-based controls for generally-applicable, technology-based effluent limitations, the majority allows the EPA to return clean water regulation to the pre-1972 era.

The EPA does not itself argue that the language of 33 U.S.C. § 1311(b)(1)(B)—that "there shall be achieved . . . effluent limitations based upon secondary treatment"—gives it discretion to set effluent limitations lower than those deemed attainable through the application of secondary treatment. The majority's resolution, to the extent it finds discretion for the EPA's decision from

the term "based upon," see Maj. Op. at 27-28, is premised on its own construction of the statute, not the EPA's.  That runs counter to the logic of Chevron deference and consequently to a core principle of judicial review of agency action.  "If the basis stated by the agency for its decision is insufficient, we may not supply another that the agency itself has not chosen to rely on."  American Meat Inst. v. EPA, 526 F.2d 442, 453 (7th Cir. 1975) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[T]he court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.  To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.")).  If Congress has implicitly or explicitly left gaps in a statutory scheme, Chevron requires us to defer to reasonable efforts on the part of the agency to fill those gaps through policy and rule-making, see 467 U.S. at 843-44, and is explicitly concerned with the agency's construction of congressional language to fill those gaps, id.  Such gap-filling can only be upheld if the agency's own rationale for its actions—including its construction of the statute—is proper.[1]

_____

[1]The majority argues that I fail to distinguish between "the *source of* agency discretion, which we must determine in the first instance under Chevron, and the *basis for* the agency's exercise of its discretion, for which . . . we may not supply our own rationale."  Maj. Op. at 28 n.17.  The majority's distinction is untenably semantic because an agency's exercise of discretion under Chevron must be based on its claimed statutory source of discretion.  In reviewing the

(continued...)

-2-

Reviewing the Agency's denial of Maier's petition, its briefs, as well as the material accompanying its earlier promulgation and amendment of secondary treatment regulations, I can find no suggestion from the Administrator that were she to find reductions of a particular pollutant attainable by means of secondary treatment, she would not need to promulgate a generally-applicable effluent limitation for that pollutant.  Indeed, the Agency may hold a contrary view of its § 1311(b)(1)(B) discretion.  In responding to Maier's petition, the Administrator states that were technologies to control NOD considered to be secondary treatment, "[a]ny such revised secondary treatment requirements would be universally applicable to all POTWs pursuant to section 301(b)(1)(B) [33 U.S.C. § 1311(b)(1)(B)]."  A.R. at 123-24; see also EPA Br. at 26 ("Were NOD

---

[1](...continued)
former, a court is bound to review the latter.  The majority would have the reviewing court independently root through the statute on its own cognizance looking for gaps that the agency's policymaking might permissibly back-fill. What the majority has done is to identify an ambiguous portion of the statute, i.e. the "based upon" language of § 1311(b)(1)(B), and defended the agency's failure to promulgate generally-applicable NOD effluent limitations on the basis of the court's own construction of that ambiguous term.  Quite aside from the fact that the EPA has implicitly disavowed this particular construction of the statute, Chevron contains absolutely no authorization for approving administrative constructions in this manner.  The most that the majority can conceivably make of the "based upon" language of § 1311(b)(1)(B) is that the administrative construction of "secondary treatment" does not violate that particular statutory provision.  This view is probably unsustainable in light of the EPA's previous interpretation of § 1311(b)(1)(B).  But even assuming its validity, the majority's view fails to show that the administrative construction of "secondary treatment" does not fall afoul of some other provision of the CWA.

limitations to be made part of 'secondary treatment,' they would apply to all POTWs regardless of local conditions.").

Moreover, the relevant regulatory history strongly suggests that the Agency would not interpret the "based upon" language in § 1311(b)(1)(B) to give it discretion to depart from reductions attainable by the technology described in 33 U.S.C. § 1314(d)(1). Effluent limitations on POTWs are set pursuant to 40 C.F.R. § 133.102. This regulation, which the Agency refers to as the Secondary Treatment Information regulation, consistently cites both § 1311(b)(1)(B) and § 1314(d)(1) as its statutory authority, see, e.g., 41 Fed. Reg. 37222 (1976), and has never suggested that reductions deemed attainable via secondary treatment need not be translated directly into applicable effluent limitations. Rather, the Agency has implicitly viewed the Secondary Treatment Information regulation as simultaneously satisfying both its information publication obligations under § 1314(d)(1) and its limitation promulgation obligations under § 1311(b)(1)(B). See, e.g., 42 Fed. Reg. 54664 (1977) ("The Secondary Treatment Information regulation contains effluent limitations in terms of biological oxygen demand, suspended solids and pH which must be achieved by municipal wastewater treatment plants . . . in accordance with section 301(b)(1)(B) of the . . . FWPCA. The Secondary Treatment Information regulation was promulgated pursuant to section 304(d)(1) of the FWPCA.").

In fact, the Agency appears to regard the Secondary Treatment Information regulation as simultaneously <u>defining</u> secondary treatment <u>and</u> establishing the effluent limitations applicable to POTWs. <u>See</u> 41 Fed. Reg. 37222 (1976) ("Secondary treatment (as defined in 40 C.F.R. 133) is the minimum level of treatment required for all publicly-owned treatment works."); 49 Fed. Reg. 36987 (1984) ("The secondary treatment regulation defines 'secondary treatment' as attaining an average effluent quality for both biochemical oxygen demand, five-day (BOD 5) and SS of 30 mg/l in a period of 30 consecutive days, an average effluent quality of 45 mg/l for the same pollutants in a period of 7 consecutive days, and 85 percent removal of the same pollutants in a period of 30 consecutive days."). Agency practice has thus never recognized a disjunction between its obligation to publish attainable reductions under § 1314(d)(1) and to promulgate effluent limitations under § 1311(b)(1)(B). Yet the majority's "based upon" analysis would create this disjunction and effectively attribute it to the Agency's discretion.

The Agency claims "considerable discretion . . . to define 'secondary treatment.'" EPA Br. at 27. Exercising this definitional discretion, the Agency asserts that controls on NOD and nutrients "simply should not be required as part of 'secondary treatment.'" <u>Id.</u> at 25. Were the Administrator responding to Maier's petition in a regulatory vacuum, we might be required to defer to this

-5-

agency definition of secondary treatment. But that is not the case. The secondary

treatment regulations have always set controls on biological oxygen demand

(BOD), see 38 Fed. Reg. 10642 (1973) (defining minimum level of BOD

reduction attainable through application of secondary treatment), and such "gap-

filling" appears entirely consistent with the applicable legislative history.[2]

Moreover, as noted above, BOD controls, in conjunction with those imposed on

certain other pollutants such as suspended solids, have been administratively

regarded as defining secondary treatment.

The Agency recognizes that NOD is one of two components of BOD, the

other being carbonaceous BOD (or "CBOD"). See, e.g., 48 Fed. Reg. 52272,

52274 (1983). Maier's petition therefore requests the Agency to apply specific

controls to a pollutant whose restriction falls broadly within the administrative

and legislative understanding of secondary treatment. Of course, given the EPA's

statutorily-conferred discretion to achieve "effluent limitations based upon

secondary treatment," § 1311(b)(1)(B), the EPA may not be obliged to impose

secondary treatment-based controls on NOD. But having included the control of

oxygen-depleting compounds within the general definition of secondary

---

[2]"Secondary treatment as considered in the context of a publicly-owned treatment works is generally concerned with suspended solids and biologically degradable, oxygen demanding materials (BOD)." H. Rep. No. 92-911, 92d Cong., 2d Sess., at 101 (1971), quoted in Proposed Rule, 48 Fed. Reg. 52272, 52273 (1983).

treatment, it is incumbent upon the EPA to explain its refusal to promulgate NOD and nutrient limitations.

In the past, the Administrator has principally explained the refusal to treat NOD controls as part of secondary treatment as proceeding from the impracticality of such controls. See, e.g., 49 Fed. Reg. 36986, 36988 (1984); 48 Fed. Reg. 52272, 52273 (1983) (citing supporting documentation for 1973 regulations). Such a decision, if adequately supported by the record, is well within the Administrator's rulemaking discretion. In denying Maier's petition, the EPA now points to two factors. First, the Agency reiterates that secondary treatment is concerned with the removal of carbonaceous organic material. This argument begs the question. If Maier's petition questions the EPA's earlier conclusion as to non-attainability, the Agency should explain its continued reliance on its previous explanation. The EPA has not done so, instead insisting that any new information on attainability submitted by Maier "does not establish (or even suggest) why control of nitrogen or phosphorus should be considered secondary treatment." A.R. at 125.

That error alone would not require us to remand to the Agency were the second factor relied on by the Administrator to deny Maier's petition more persuasive. It is not. The Agency's second defense of its secondary treatment regulations is to point to its policy preference for quality-based controls rather

than generally applicable limitations, at least for pollutants that do not have a uniform impact on receiving bodies of water. See A.R. at 113-14, 123; see also EPA Br. at 19-20. The EPA may yet have good reasons for refusing to regulate NOD via generally-applicable effluent limitations on POTWs, but a policy preference for quality-based measures over generally-applicable technology-based measures is not one of them. Such a preference improperly construes the CWA.

Before 1972, the stated purpose of the Federal Water Pollution Control Act ("FWPCA") was "to enhance the quality and value of our water resources and to establish a national policy for the prevention, control, and abatement of water pollution." 33 U.S.C. § 1151(a) (1970) (superseded by Pub. L. 92-500, § 2, 88 Stat. 816 (1972)). To this end, the pre-1972 legislation employed ambient water quality standards as the primary mechanism for water pollution control. See EPA v. California State Water Resources Control Bd., 426 U.S. 200, 202 (1976). The 1972 Amendments to the FWPCA, popularly known as the Clean Water Act, deliberately ended this approach. Prompted by the Senate Committee on Public Works' review of the FWPCA program, and its conclusion that "the national effort to abate and control water pollution has been inadequate in every vital respect," S. Rep. 92-414, at 7, reprinted in 1972 U.S.C.C.A.N. 3668, 3674, Congress declared as the new national goal of the program that "the discharge of pollutants into the navigable waters be eliminated," 33 U.S.C. § 1251(a)(1).

Consistent with this end, the CWA substituted technology-based, generally-applicable effluent limitations for water quality-based regulatory approaches.  See State Water Resources Control Bd., 426 U.S. at 204 ("Such direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated.").  The legislative history of the Act is replete with references to the need for this substitution.[3]

The EPA's denial of Maier's petition effects an entirely opposite substitution.  In order for an administrative construction that runs counter to basic policies underlying the relevant statutory scheme to be reasonable under the second step of Chevron, the implementing agency must point to some language in the statute to justify its policy conclusion—here, that the POTW regulatory regime can legitimately depart from the core public policy of the CWA.[4]  The

_____

[3]The Senate Report accompanying the CWA notes:  "The application of Phase I technology to industrial point sources is based upon the control technologies for those sources and to publicly owned sewage treatment works is based upon secondary treatment.  It is not based upon ambient water quality considerations."  S. Rep. 92-414, at 43, reprinted in 1972 U.S.C.C.A.N. 3668, 3710 (emphasis added).

[4]Contrary to the majority's assertion, placing this obligation on the Administrator does not "turn[] the Chevron test on its head."  Maj. Op. at 33.  Chevron authorizes the Administrator to fill legislative gaps, but only when done in compliance with her statutory policymaking discretion.  Chevron, 467 U.S. at 843-44.  Here, the EPA has without justification chosen to fill a gap by means of a policy that contravenes the most fundamental tenet of the CWA.  See Maislin

(continued...)

Administrator has not done so. Her passing reliance on § 1311(b)(1)(C), which allows the Administrator to set "more stringent limitation[s]" to meet water quality standards, is misplaced. At most, that provision allows the Administrator to set quality-based limits for pollutants that cannot be attainably reduced by secondary treatment, or to set supplementary quality-based limits for pollutants already regulated by a floor of generally-applicable limitations based on secondary treatment. It cannot reasonably be read as general discretion to redefine secondary treatment to cover only those pollutants that are—in the view of the Administrator—more appropriately regulated via generally-applicable regulations rather than case-by-case quality-based limits. That interpretation makes a mockery of the primacy accorded technology-based regulation by the plain language and legislative history of the CWA.

In fact, Congress has itself confirmed that POTWs are not exempted from this core policy. In 1977, Congress enacted 33 U.S.C. § 1311(h), which permits the Administrator, on a case-by-case basis, to relax secondary treatment requirements for POTWs releasing pollutants into marine waters. See 33 U.S.C. §

---

[4](...continued)
Indus., U.S. v. Primary Steel, 497 U.S. 111, 134-35 (1990) (agency "does not have the power to adopt a policy that directly conflicts with its governing statute"). Without some language suggesting that POTWs are exempt from the force of this basic statutory imperative, the EPA's regulatory inaction must be regarded as "manifestly contrary to the statute," and accordingly invalid under Chevron. 467 U.S. at 844.

1311(h).  If the EPA has the discretion relied on by the Administrator in the present case, this provision was (and is) entirely unnecessary.  The Administrator could simply declare that the biological treatment of pollutants by POTWs that release into marine waters is not "secondary treatment" because she has made the policy choice to address such discharges solely through individual NPDES permit requirements.  In passing § 1311(h), Congress effectively stated that such discretion was not open to the Administrator.  Cf. Bridger Coal Co. v. Director, Office of Workers' Compensation Programs, 927 F.2d 1150, 1153 (10th Cir. 1991) (statute should be interpreted to give meaning and effect to each provision).  It is not our place to offer discretion to the Agency where Congress has not.[5]

------

[5]The majority states that it is not authorizing the EPA's exercise of general policy discretion to substitute quality-based restrictions for generally-applicable, technology-based effluent limitations, but is instead restricting the EPA's discretion to cases in which it advances a "reasoned explanation" for this substitution.  See Maj. Op. at 32.  I am not so sure.  Nowhere does the CWA suggest that its clear technology-first imperative is subject to cancellation by the agency's "reasoned explanations."  Nor does the majority explain why in the absence of statutory authorization, the EPA is free to ignore that imperative on the basis of its own "reasoned explanations."  See Director, Office of Workers' Comp. v. Newport News, 115 S. Ct. 1278, 1288 (1995) ("Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means . . . . The withholding of agency authority is as significant as the granting of it, and we have no right to play favorites between the two.").  Finally, the majority fails to explain why the qualitative variability of pollutant discharges constitutes such a "reasoned explanation," or what other types of agency explanation would or would not allow for a similar departure from the basic public policy of the CWA.  Without some limiting principle, it is hard not to conclude that the majority is essentially deferring to the EPA's policy preference for quality-based standards.

On a number of occasions, the Agency has itself confirmed that "effluent limitations based upon secondary treatment" cannot be fixed by reference to quality-based considerations. See, e.g., 38 Fed. Reg. 22298 (1973) (POTW effluent limitation regulation "is to be based on the capabilities of secondary treatment technology and not ambient water quality"); 41 Fed. Reg. 30786, 30788 (1976) (same). In denying Maier's petition, the Administrator alludes to this constraint, see A.R. at 117 ("[T]he definition of secondary treatment is to be technology-based rather than water quality based"), then ignores it without explanation.

The denial of Maier's petition must be "based on a consideration of the relevant factors." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Here, the EPA's denial is based on one factor that is illegitimate—its "reasoned" policy preference for quality-based over generally-applicable, technology-based restrictions—and another that is legitimate but unsubstantiated—the nonattainability of NOD reductions.[6] I would remand the

---

[6]The majority states that I view technological feasibility as the "only criterion" that the EPA can use to define secondary treatment. Maj. Op. at 26. That is incorrect. Our review is appropriately confined to the reasons given by the EPA for its denial of Maier's petition. In my view, the only argument the EPA offers that is not "manifestly contrary to the statute," is one based on unsubstantiated claims of technological feasibility. This should not be contorted to mean that the EPA's only possible basis for defining secondary treatment is technological feasibility.

-12-

petition to the Agency for reconsideration in light of the correct legal principles.

See American Horse Protection Ass'n v. Lyng, 812 F.2d 1, 7-8 (D.C. Cir. 1987).